[No. D049650. Fourth Dist., Div. One. Nov. 14, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
PEDRO ALEXANDER ZEPEDA GARCIA et al., Defendants and
Appellants.

264

COUNSEL

Doris M. Frizzell, under appointment by the Court of Appeal, for Defendant and Appellant Geraldo Ojito.

Kerry L. Steigerwalt for Defendant and Appellant Pedro Alexander Zepeda Garcia.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillett and Gary W. Schons, Assistant Attorneys General, Gil Gonzalez, Lynne McGinnis and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**O'ROURKE, J.**—A jury convicted Pedro Alexander Zepeda Garcia (also known as Teddy) and Geraldo Ojito (also known as Mist) of first degree murder (Pen. Code, § 187, subd. (a)). The jury found Garcia personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)), and that Ojito was vicariously armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). The court sentenced Garcia to 50 years to life and Ojito to 25 years to life in state prison.

Ojito contends (1) there was no substantial evidence he aided and abetted a premeditated murder; (2) the court prejudicially erred by admitting irrelevant, inflammatory, and cumulative gang evidence; (3) he was denied due process of law by being jointly tried with Garcia; (4) the court prejudicially erred by admitting evidence concerning his arrest following a SWAT standoff; (5) the admission of two notes written by a cellmate to prove he attempted to intimidate witnesses violated the rules of evidence and his rights under the Sixth Amendment confrontation clause; (6) the cumulative impact of the trial errors deprived him of his Fourteenth Amendment due process right to a fair trial; and (7) a clerical error in the abstract of judgment must be corrected.

Garcia contends (1) the denial of his motion to sever his case from Ojito's deprived him of a fair trial; (2) the admission of gang evidence and the notes written by Ojito's cellmate deprived him of a fair trial; and (3) he was prejudiced by the admission of autopsy photographs of the victim. Both defendants also join in the other's arguments on appeal. We affirm.

FACTS

Ojito and Garcia were the founding members of a tagging crew that evolved into a gang known as TNS (Trust No Souls). Victim Manuel Barajas

(also known as Bonk or Manny) was a member or former member of another tagging crew that had become a documented gang known as ALS (Another Logan Soldier).

On the afternoon of August 11, 2002, Barajas, his longtime friends Jesus Garcia (also known as Cheech) and Jesus Flores (also known as Bozo), and Flores's four-year-old son Javier stopped at the Gigante Market on 32d Street and National Avenue in southeast San Diego to buy carne asada for a picnic at the beach.[1] When they exited Cheech's truck in the parking lot, defendant Garcia approached them from across the street. Garcia and Barajas, who had fought previously, agreed to a one-on-one fight and walked into the alley behind the market.

A few minutes later, Cheech, Flores, and Javier walked toward the alley and met Barajas coming out of the alley. They saw Garcia on the ground trying to stand up. Barajas told them he had knocked out Garcia with one punch. The group then entered the market to buy their groceries for the beach. Flores pointed out that Barajas had blood on his shirt, so Barajas left the store and went home to change his shirt. Barajas lived with his sister and brother-in-law in a house on the 3200 block of Logan Avenue around the corner from the market.

After they bought their groceries, Cheech, Flores, and Javier got into Cheech's truck and Cheech drove toward Barajas's house. As they passed the alley between National Avenue and Logan Avenue to the north, they saw a group of four to eight Hispanic males run out of the alley toward the market. One of the males raised a hand and gestured or pointed toward the truck. Cheech drove past Barajas's house without stopping to pick up Barajas as planned because he did not want to bring trouble to the house. Instead, he turned right on 33d Street, drove one block south to National Avenue, turned right on National Avenue (westbound) and drove two blocks to 31st Street, turned right on 31st Street and then right from 31st Street back onto Logan Avenue (eastbound), and parked in the middle of the 3100 block of Logan Avenue. Cheech, Flores, and Javier then exited the truck and walked east on Logan toward Barajas's house. Flores was carrying a car club (steering wheel locking device) he took from the truck.

Meanwhile, a group of Hispanic males that included appellant Ojito's older brother Mario Ojito (also known as Casper)[2] confronted residents of Gary Reyes's home on the 3100 block of Logan, demanding to know where

---

[1] For clarity, we may refer to individuals by their nicknames used at trial. We intend no disrespect.

[2] Mario Ojito was tried for Barajas's murder with the other two defendants and acquitted.

"Manny" was. Reyes told them there was no Manny living there and asked them to leave his property.

Some or all of the group, including Casper, then went to Barajas's house on the 3200 block of Logan and confronted Barajas's brother-in-law Angel Zepeda, who was in his front yard with his two-year-old daughter. Casper challenged Zepeda, saying, "What's up mother-fucker? You want some of this shit too, or what?" At some point, Barajas came out of the house onto the front porch and Ojito joined the group. Casper said to Barajas, "What's up fool? Come out here, punk. Come outside fool." A minute or two later, Garcia's cousin Favio Garcia (also known as Thief) rode up on a bicycle and joined the group. He yelled at Barajas, "You jumped my cousin, fool!" Barajas responded, "I didn't jump nobody, fool. I beat his ass." Thief then pulled a handgun from his midsection, pointed it at Barajas, and pulled the trigger, but the gun did not fire. He lowered the gun and looked at it, pointed it at Barajas and pulled the trigger a second time, and the gun again failed to fire.

The group left Zepeda's property and Zepeda took his daughter into the house and locked the front door, leaving Barajas outside. A few minutes later, Zepeda put his son and daughter in his car and drove eastbound on Logan Avenue. As he drove away, he saw Barajas standing on the corner of Logan and 32d Street with a neighbor.

When Cheech, Flores, and Javier exited Cheech's truck and started walking toward Barajas's house, they saw Barajas on the corner of 32d Street and Logan walking toward them. Barajas met them near the corner and they all began to walk westbound toward Cheech's truck while Barajas told them about the incident that had just occurred at his house.

Before they reached the truck, Garcia and Ojito confronted them on the sidewalk. Garcia was wearing a backpack on his chest and had his hand in the backpack. Flores brandished the car club he had taken from Cheech's truck and told Ojito and Garcia to "back the fuck up" because his son was with him. Moments later, a red car driven by Yovani Pineda stopped at the scene of the confrontation. Casper and Ojito's younger brother, Victor Rodriguez, immediately exited the car and joined Ojito and Garcia. Pineda also joined the group after pulling his car to the curb.

Pineda had been driving to Garcia's house to visit him after taking his girlfriend home when he saw Rodriguez and Casper on the sidewalk. They called out to him and waived him over, so he made a U-turn and stopped to pick them up. He knew Rodriguez but had never met Casper. Rodriguez told

Pineda to pick up Garcia because Garcia had gotten into a fight and had been hit. Rodriguez then directed Pineda to the scene of the confrontation.

At the scene, Garcia was holding a white, bloodstained shirt over his right temple and forehead area, and had a large lump on that area of his head. He appeared to be dazed and dizzy. Ojito, Casper, and Garcia accused Flores, Cheech, and Barajas of jumping Garcia, and Ojito asked what Garcia had been hit with.[3] Flores, Cheech, and Barajas replied that nobody had jumped Garcia. Cheech and Flores told Garcia to "take an ass whooping like a man." Garcia responded "Fuck that shit, fuck that shit." He started to pull a gun out of his backpack and Cheech told him, "Put that thing away." He responded, "It's put away," but he kept his hand in the backpack.

Casper mainly confronted Flores, standing almost chest-to-chest in front of him. Flores attempted to put Javier in an adjacent fenced-in yard, but Casper prevented him from doing so. Flores told Casper, "Back the fuck up off me. Don't you see my son next to me?" Ojito who was standing next to Garcia, leaned toward Garcia and whispered something to him. Then Ojito and Garcia told Barajas he had "better run."[4] Barajas started running westbound and Garcia took the handgun out of his backpack and fired it at Barajas. Barajas jumped over a fence into a yard and Garcia and Ojito ran after him. Garcia fired more shots and Barajas fell in the yard, got up and ran a few more steps, and then fell again.

Pineda, Garcia, and Ojito then ran to Pineda's car and got into the car, and Ojito told Pineda to drive. As Pineda drove away from the scene, Garcia gave the gun to Ojito. Garcia told Pineda to drive to a nearby Costco store to look for a telephone. When they did not find a telephone at the store, Pineda drove toward his house so Garcia and Ojito could use the telephone there.

Near Pineda's house, police officers in a patrol car made a U-turn and followed Pineda's car with their overhead lights activated. Pineda did not stop until he drove into his driveway because he did not have a license and did not want the police to take his car. Before Pineda stopped, Ojito announced he was going to run. When the car stopped, Ojito immediately jumped out and ran from the scene with the gun.

Police arrested Garcia and Pineda in front of Pineda's house. An officer who arrived to assist the first officers at the scene attempted to find Ojito by following the path he had taken. A nearby resident told the officer she had

---

[3] Pineda later told an investigator with the district attorney's office that Ojito did most of the talking at the scene.

[4] There was testimony that both Ojito and Garcia said, "You'd better run homes [or fool]. You'd better run."

heard someone run across her roof. The officer climbed onto the roof and found six spent bullet casings on a vent cap. Ojito was arrested about six weeks later at the home of Jose Michael Rodriguez, also known as Che Che, following a standoff with the San Diego Police Department SWAT team.

Barajas sustained three gunshot wounds. He died from blood loss caused by a bullet that entered his back and severed his spinal cord and then hit a major (portal) vein, adrenal gland, his liver and a rib before coming to rest under the skin of his chest.

## DISCUSSION

### OJITO'S APPEAL

### I. Sufficiency of the Evidence to Support Murder Conviction

Ojito contends there is no substantial evidence that he aided and abetted premeditated murder of Barajas. We disagree.

"To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant to be guilty on the theory presented." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528–529 [26 Cal.Rptr.2d 323], citing *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

"[T]he law imposes criminal liability upon all persons 'concerned' in the commission of a crime. [Citation.] As a legal standard this provision creates what may be considered a 'bright line' rule. If a person is 'concerned' in the commission of a crime then he is guilty of that crime without assessment of the degree of his involvement otherwise. 'Liability attaches to anyone "concerned," however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal.' [Citations.] A person is 'concerned' and hence guilty as an aider and abettor if, with the requisite state of mind, that person in any way, directly or indirectly, aided the actual perpetrator by acts or encouraged the perpetrator by words or gestures. [Citations.]

"Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime,

although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime. [Citation.] However, . . . '[t]he requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense. Also like a conspirator, he is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . ■ " 'One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it. . . . Moreover, the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable consequences of any act that he knowingly aided or encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.' " . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent of the target offense, which . . . must be found by the jury.' " (*People v. Nguyen, supra,* 21 Cal.App.4th at pp. 529–530.)

Factors to be considered by the trier of fact in determining "whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime." (*People v. Jones* (1980) 108 Cal.App.3d 9, 15 [166 Cal.Rptr. 131].)

The evidence of the confrontation in front of Barajas's house involving Zepeda and Barajas on the one side and Casper, Thief and Ojito on the other side shows that shortly after his fight with Barajas, Garcia communicated his version of the fight to friends and relatives (e.g., Thief), who immediately embarked on a quest to find Barajas to avenge Garcia's beating. Based on

Thief's failed attempts to shoot Barajas as he stood on his front porch, the jury could reasonably conclude that the intent of the group seeking Barajas, including Ojito, was to murder him or cause him great bodily harm. As we discuss more fully, *post*, Ojito's intent to aid and abet the murder of Barajas, or an offense of which Barajas's murder was a natural and probable consequence, is further supported by evidence that Ojito and Garcia were founding members of the gang TNS, and evidence regarding gang culture.

Ojito's conviction of murder as an aider and abettor is also supported by the evidence of his companionship with Garcia and his presence and actions at the scene of the crime. The testimony of Pineda and other witnesses to the shooting of Barajas supports findings that Ojito did most of the talking in the confrontation leading to the shooting, was aware Garcia had a gun in his backpack before the shooting, whispered something to Garcia and joined with Garcia in telling Barajas he had better run seconds before the shooting began, and ran after Barajas with Garcia as Garcia repeatedly shot Barajas. Based on this evidence alone, the jury could reasonably find that Ojito, with the requisite state of mind for criminal liability, encouraged Garcia in the shooting of Barajas and therefore is guilty of Barajas's murder as an aider and abettor.

Evidence of Ojito's conduct after the shooting further supports the finding that he aided and abetted Barajas's murder. The evidence showed he fled from the scene with Garcia in Pineda's car, took the murder weapon (gun) from Garcia in the car, and fled with the gun when the police stopped the car and ultimately disposed of it. As noted, a defendant's conduct after a crime, including flight, is a relevant factor in determining his liability for aiding and abetting the crime. (*People v. Jones, supra,* 108 Cal.App.3d at p. 15.)

Ojito's liability for first degree murder as an aider and abettor is supported by substantial evidence that he knowingly encouraged the murder of Barajas, or a firearm assault of which Barajas's murder was a natural and probable consequence.

## II. *Admission of Gang Evidence*

Ojito contends he was denied a fair trial and due process of law by the court's admission of irrelevant, inflammatory, and cumulative gang evidence. The court admitted the evidence in question over defense objections that it was irrelevant and unduly prejudicial (Evid. Code, § 352) and improper character evidence (Evid. Code, § 1101). The court gave the jury the following limiting instruction: "Evidence that a defendant is a member of a gang alone cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement, or instigation needed to establish aiding and abetting."

■ "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1], italics omitted.)

■ Accordingly, " '[t]he admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]' [Citation.] Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citations.] [¶] The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.] '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [25 Cal.Rptr.3d 124].) Accordingly, when evidence of gang activity or affiliation is relevant to motive, it may properly be introduced even if prejudicial. (*People v. Martinez* (2003) 113 Cal.App.4th 400, 413 [7 Cal.Rptr.3d 49].)

To prevail on his argument that he was denied a fair trial and due process of law by the admission of gang evidence, Ojito must show that the admission of the evidence was erroneous, and that the error was so prejudicial that it rendered his trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 436, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230 [57 Cal.Rptr.3d 92].)

The gang evidence in question included testimony from Eric Morales, a gang detective with the San Diego Police Department who monitored gang sets in the Logan Heights area of southeast San Diego. Morales testified that the definition of a gang is "three or more people who share a common sign,

turf, territory, or criminal enterprise. They associate internally on a continuous basis, and they commit crimes under Penal Code [section] 186.22."[5] Morales gave general testimony about Logan sets and testified that Flores and Barajas were members of ALS, a tagging crew in the Logan area that had "graduated to become a documented gang." He testified about photographic exhibits showing gang-related tattoos on Casper and Thief.

Morales explained that gang members frequently commit crimes together to increase the reputation of their set, and that if one gang member gets in a fight, his fellow "gang member friends will also join in the fight to back him up." He further testified that a gang member's committing a shooting with other gang members present raises the gang and community status and notoriety of both the shooter and the other present gang members.

Gang expert Detective Ernesto Encinas testified that TNS members also referred to themselves as "the 211 crew," 211 being the Penal Code section defining the crime of robbery. He testified that TNS was initially a tagging crew and the gang claimed southeast San Diego as its territory. The gang's rivals were UF (Unfadable) and KN (Kriminal Nation).

Encinas testified about photographs taken from Che Che's residence where Ojito was arrested, including separate photographs of Ojito and Garcia in which each is holding a shotgun and flashing a 211 sign; a photograph of someone, possibly Ojito, wearing a jersey displaying the number 867, which corresponds to the letters TNS on a telephone keypad; photographs of Ojito's gang-related tattoos; and photographs of various TNS members, including Ojito and Garcia, throwing 211 and TNS signs and holding guns.

Regarding gang culture, Encinas testified that gang members increase their respect within their set and the community through acts of violence and intimidation, and that the best way for a gang member to increase the status of his set is to assault a rival gang member. He explained that a gang member is expected to back up his fellow gang members "whatever they do[,] whether it's a crime or whether it's a fight or helping them from law enforcement— from apprehension [by] law enforcement." Assisting a fellow gang member in the commission of a crime elevates one's status and respect within the set because it shows loyalty to the gang and a willingness to back up the gang no matter what the consequences. Not backing up a fellow gang member results in loss of respect within the gang and may subject a member to assault by fellow gang members or being thrown out of the gang. Encinas testified that

---

[5] Subdivision (e) of Penal Code section 186.22 lists offenses that can form the basis of a " 'pattern of criminal gang activity' " when two or more are committed, attempted, or solicited within a specified time period by two or more persons.

being a "snitch" or "rat" is the "lowest you can be in a gang," with consequences ranging from ostracism to being murdered.

The "gang evidence" also included testimony by Cheech, Flores, and Pineda about their knowledge of and experience with Logan area gangs and tagging crews. Cheech testified he was formerly affiliated with a graffiti set known as UWK (Underworld Kings) and was familiar with ALS, which he viewed as "just a graffiti crew" and not a gang. He had heard of TNS as "just another graffiti crew" but had not met any of its members and was not aware of any conflict between TNS and ALS before Barajas's murder.

Flores testified he had been a member of ALS for 10 or 11 years—since he was about 11 years old. Flores was familiar with the Logan gang sets in the area where he grew up and viewed ALS as a tagging crew and not a gang. In his opinion the gangs probably had more power or authority in the streets than the tagging crews. Flores did not have any friends in TNS but he knew who Ojito was from seeing him in the neighborhood.

Pineda referred to TNS as a gang and testified that he had been a member of TNS for about three years. He demonstrated TNS's 211 hand sign and identified various TNS members in photographic exhibits. Before the shooting, he got along with everybody in TNS and had considered Garcia and Ojito to be his friends. He had done graffiti with Garcia and had stolen computers and television sets from a school with another TNS member.[6] When he was a member of TNS, TNS "did not get along with" UF and KN, but he was not aware of any problems between TNS and ALS before Barajas's murder.[7]

We conclude the trial court acted well within its discretion in admitting the gang evidence in question because the evidence is relevant to Ojito's intent and motive to aid and abet Barajas's murder, or an offense of which Barajas's murder was a natural and probable consequence. The gang evidence was relevant to show the relationship between Ojito and Garcia and the nature of the organization they had strived to create. The various photographs showing Garcia, Ojito, and other TNS members flashing their 211 sign and brandishing guns showed they undertook to "elevate" the status of TNS from tagging crew to a gang patterned after established multigenerational Logan gangs—i.e., that they intended TNS to be perceived as a gang rather than a

---

[6] Pineda was apprehended for that crime and admitted to it as part of an agreement to testify in this case.

[7] In addition to the above noted gang evidence, Ojito cites, as prejudicial, the prosecution's reference during rebuttal argument to portions of letters written by Ojito in which the letters "ALS" are crossed out where they appear in words such as "also." Ojito states these letters were admitted by stipulation.

tagging crew. In light of this evidence of their gang mentality, the expert testimony about gang culture—particularly the testimony about the obligation of gang members to back up fellow gang members—was relevant to prove Ojito's intent to aid Garcia in avenging Garcia's beating. The jury could reasonably infer from that evidence that Ojito encouraged Garcia to confront and assault Barajas before they encountered him on the 3100 block of Logan Avenue, regardless of whether Garcia's own motive to shoot Barajas was gang related or strictly personal.

The jury's acquittal of Casper strongly indicates that the gang evidence was not unduly prejudicial—i.e., that its prejudicial effect did not outweigh its probative value. Casper was a member of a long-established gang known as Logan Red Steps and, according to Flores, he claimed his affiliation with that gang at the scene of the shooting. The evidence before the jury included a photograph of Casper with the word "Logan" tattooed across his neck. Casper's acquittal shows the gang evidence did not have the prejudicial effect of causing the jury to convict solely because of gang affiliation. The acquittal indicates the jury followed the court's instruction that gang membership alone could not serve as proof of aiding and abetting, assessed each defendant's guilt and innocence on an individual basis, and properly based its determinations on the evidence regarding each defendant's conduct at the scene of and after the shooting. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1150–1151 [248 Cal.Rptr. 600, 755 P.2d 1049] [The jury's finding of guilt as to one defendant and impasse as to another where evidence against both was limited to eyewitness identification indicated the "jury thoughtfully considered all the evidence before it, and individually evaluated the strength of the eyewitness evidence against each of the two defendants"], citing *People v. Walker* (1986) 185 Cal.App.3d 155, 166 [229 Cal.Rptr. 591] [jury's acquittal of codefendant on one count indicated its concern with reaching a fair result].) Casper's acquittal supports the conclusion that the court did not exceed the bounds of reason in ruling the probative value of the gang evidence outweighed its prejudicial effect. Having found no error in the admission of gang evidence, we reject Ojito's contention that its admission denied him a fair trial and due process of law.

### III. *Joint Trial*

Ojito contends he was denied due process of law by the joint trial with Garcia because the court admitted evidence of highly inflammatory statements by Garcia that implicated Ojito in the murder of Barajas.[8] Ojito specifies the following evidence:

---

[8] Ojito and Garcia both moved unsuccessfully for separate trials (severance).

(1) Pineda testified that while he and Garcia were together in a holding cell before the preliminary hearing in this case, Garcia told him that after he lost the fight with Barajas he and Ojito "went looking for" Barajas.[9]

(2) The certified court interpreter read the following translations of portions of letters written by Garcia while in custody:[10]

(a) " 'I have pictures of Bonk, and I will send them to you, of his butt cheeks all hairy. Ha. Ha. That fool, that happened to him for being a dumbass. *See, I told you he would pay*. It hit Bonk in the ass and so much for that. What a hemorrhoid. Ha. Ha.' " (Italics added.)[11]

(b) " 'I got like 400 pages too of discovery. I have photos of Chuccles so tough and Bonk, all dead. That fool gots a hairy ass crack. Ha. Ha. I always trip on that. Supposedly I hit him three times.' "

(c) " 'It went through Bonk's ball and his butt cheeks. Ha. Ha.' " Alternatively, the interpreter translated this portion of the letter as follows: " 'Bonk had his ball and his butt cheeks perforated. Ha. Ha.' "

(3) Photographs of the following items recovered from Garcia's jail cell on April 4, 2004, were admitted into evidence: (a) a book in the interior of which Garcia's name and "TNS KILLZ" were handwritten; and (b) a manila envelope bearing a drawing of a teddy bear holding guns, with the number "619" (the area code for San Diego), the name "Teddy," and the initials "SD" handprinted next to the bear.

The court instructed the jury that Garcia's correspondence listed above was offered only against Garcia and could not be considered as evidence against Ojito. The court also instructed the jury, in accordance with CALCRIM

---

[9] The following exchange occurred during direct examination of Pineda:
"Q. What did he say happened in the fight?
"A. What I remember that he told me was that he had lost the fight and that he went home.
"Q. To which house?
"A. To his grandma's house.
"Q. Is that the house on Newton Street?
"A. Yes.
"Q. Did he say anything else about what he did after he got to the house on Newton Street?
"A. That they went looking for him.
"Q. Looking for who?
"A. The one that he had had the fight with.
"Q. Who went looking for the guy that he had a fight with?
"A. Pedro and Mist."

[10] The identity of the recipient of the letters was not disclosed to the jury.

[11] During trial, Ojito filed a motion for severance or redaction based in part on this letter.

No. 305 as follows: "You have heard evidence that a defendant made a statement out of court. You may consider that evidence only against him and not against any other defendant."

*Applicable law*

■ "Our Legislature has expressed a preference for joint trials. [Citation.] [Penal Code s]ection 1098 provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.] Additionally, severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' [Citations.]

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " (*People v. Lewis* (2008) 43 Cal.4th 415, 452 [75 Cal.Rptr.3d 588, 181 P.3d 947] (*Lewis*).)

■ When a joint trial results in the admission of an out-of-court statement by a codefendant that incriminates the defendant, the determination of whether the defendant was denied due process generally centers on whether the admission violated the defendant's rights under *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*). In *Lewis*, the California Supreme Court explained that "[i]n *Bruton*, the United States Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause [of the Sixth Amendment to the United States Constitution], even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant. [Citation.] The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard

inadmissible evidence, 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' [Citation.] Such a context is presented when 'the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.' " (*Lewis, supra*, 43 Cal.4th at p. 453, quoting *Bruton, supra*, 391 U.S. at pp. 127–128, 135–136.)

Three years before *Bruton*, the California Supreme Court in *Aranda* "had come to a similar conclusion on state law grounds, but . . . also concluded that the codefendant's confession may be introduced at the joint trial if it can be edited to eliminate references to the defendant without prejudice to the confessing codefendant. [Citation.] If not, and the prosecution insists on introducing the confession, the trial court must sever the trials." (*Lewis, supra*, 43 Cal.4th at p. 454, citing *Aranda, supra*, 63 Cal.2d at pp. 530–531.) *Lewis* noted that the United States Supreme Court similarly limited the scope of *Bruton* in *Richardson v. Marsh* (1987) 481 U.S. 200 [95 L.Ed.2d 176, 107 S.Ct. 1702] (*Richardson*), which held that " 'the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, *but any reference to his or her existence.*' " (*Lewis, supra*, 43 Cal.4th at p. 454, italics added, quoting *Richardson, supra*, 481 U.S. at p. 211.)

Because *Aranda/Bruton* error implicates a constitutional right, it is generally reviewed under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Brown v. United States* (1973) 411 U.S. 223, 231–232 [36 L.Ed.2d 208, 93 S.Ct. 1565]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1128 [240 Cal.Rptr. 585, 742 P.2d 1306].)

We find no abuse of discretion in the trial court's denial of defendants' requests for severance, and conclude the evidence Ojito challenges under the *Aranda/Bruton* rule did not result in gross unfairness amounting to a denial of Ojito's right to due process. In *People v. Fletcher* (1996) 13 Cal.4th 451 [53 Cal.Rptr.2d 572, 917 P.2d 187], the California Supreme Court noted that under *Richardson*, the *Bruton* rule (that the admission of a nontestifying defendant's confession implicating a codefendant in a joint trial violates the codefendant's rights under the confrontation clause, even with an appropriate limiting instruction) "extends only to confessions that are not only 'powerfully incriminating' but also 'facially incriminating' of the nondeclarant

defendant." (*Fletcher, supra*, 13 Cal.4th at p. 455, quoting *Richardson, supra*, 481 U.S. at pp. 207–208.)

None of the three letters that Ojito cites as constituting *Aranda/Bruton* error facially incriminates Ojito. Garcia's letter containing the statement, "See I told you he would pay," did not facially incriminate Ojito because the letter was properly "sanitized" under *Aranda* and *Richardson*—i.e., references to Ojito were redacted from the letter and the jury was not informed that Ojito was its recipient. The other two letters containing Garcia's mocking references to autopsy photographs of Barajas show a callous lack of remorse on the part of Garcia for Barajas's murder, but contain no reference to Ojito or any statement implicating anyone other than Garcia in the murder. Similarly, the photographs of the book bearing the notation "TNS KILLZ" and the manila envelope bearing the drawing of a teddy bear holding guns and the notations "619," "Teddy," and "SD," contain no references to Ojito or anyone else other than Garcia, and therefore do not facially incriminate Ojito.

The only extrajudicial statement at issue in this appeal that facially incriminates Ojito is Garcia's statement to Pineda that he and Ojito "went looking for the guy that [Garcia] had a fight with." However, we do not find this statement to be *powerfully incriminating* because it *facially* incriminates Ojito only by showing that he and Garcia were looking for Barajas; it is not *direct* evidence that Ojito intended Barajas would be assaulted or murdered when they found him. Moreover, the statement is merely cumulative of other overwhelming evidence that fellow gang members, friends, and relatives of Garcia, including Ojito, embarked on a quest to find Barajas minutes after his fight with Garcia. The evidence of Ojito's words and actions at the scene of the murder, in particular, strongly supports the finding that he was accompanying Garcia on a mission to find Barajas.

To the extent the admission of Garcia's statement to Pineda constituted *Aranda/Bruton* error,[12] we conclude it was harmless beyond a reasonable doubt. As we discussed *ante*, Ojito's conviction of murder as an aider and

---

[12] The People suggest there was no *Aranda/Bruton* error because none of Garcia's out-of-court statements in question were *testimonial*—i.e., none were made under circumstances that would lead an objective witness to believe they would be available for use at a later trial. The People rely on *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), in which the United States Supreme Court held that the Sixth Amendment bars "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." (Italics added.) Whether the *Aranda/Bruton* rule applies only to extrajudicial *testimonial* statements appears to be an unsettled question, and one that we need not address in this case. We note, without citation or reliance, that there is inconsistency in unpublished California appellate court opinions on the issue. We also note the federal Third Circuit Court of Appeals has "interpreted *Bruton* expansively, holding that it applies not only to custodial

abettor was amply supported by the evidence, especially the evidence of his actions at the scene of the murder and his conduct immediately after the shooting. We are satisfied beyond a reasonable doubt that the exclusion of Garcia's out-of-court statement that he and Ojito went looking for Barajas would not have resulted in a more favorable outcome at trial for Ojito.

## IV. *Evidence of Ojito's Arrest Following a SWAT Standoff*

Ojito contends the court prejudicially erred by admitting evidence concerning his arrest following a SWAT standoff. The evidence consisted of an audiotape recording of Ojito's telephone conversation with a police negotiator that led to his surrender,[13] and the testimony of the negotiator and another police officer about the incident. Ojito objected to the evidence as unduly prejudicial and irrelevant under Evidence Code section 352. On appeal, Ojito cites, as particularly prejudicial, his statements to the negotiator that he wished he had a shotgun and that he wanted to come out of the house high on marijuana, and his reference to broadcast news reports about "things he had done." The court ruled the evidence was probative of consciousness of guilt and that its probative value outweighed its prejudicial effect as to Ojito, but the court instructed the jury to consider the evidence only against Ojito.

As noted, the trial court enjoys broad discretion in assessing whether the probative value of evidence is outweighed by its prejudicial effect, and its assessment will not be disturbed on appeal absent a showing it exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice. (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124–1125.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional . . . test [set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]]: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida, supra,* 37 Cal.4th at p. 439.)

Evidence of a defendant's resistance to arrest, like evidence of flight, is admissible as evidence of the defendant's consciousness of guilt. (*People v. Odle* (1988) 45 Cal.3d 386, 403 [247 Cal.Rptr. 137, 754 P.2d 184], abrogated on another ground as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 256

---

confessions, but also when the statements of the non-testifying co-defendant were made to family or friends, and are otherwise inadmissible hearsay." (*U.S. v. Mussare* (3d Cir. 2005) 405 F.3d 161, 168.)

[13] The court provided each of the jurors a written transcript of the tape recording to read while the tape was being played.

[133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Wong* (1973) 35 Cal.App.3d 812, 831 [111 Cal.Rptr. 314].) Ojito argues the evidence concerning his SWAT standoff is unduly prejudicial because the jury was unaware that at the time of the standoff, he was wanted in connection with two other shooting incidents in which he was alleged to have been the shooter, one of which resulted in the deaths of two persons. Ojito contends the jury was encouraged to draw the likely false inference that Ojito "demonstrated an exaggerated consciousness of guilt solely in connection with the killing of Mr. Barajas." He also argues the jury likely used the evidence as impermissible character evidence.

We have found no California authority addressing the issue of whether evidence of consciousness of guilt should be excluded as unduly prejudicial when the defendant has committed an offense of which the jury is unaware and the evidence could relate to the undisclosed offense in addition to, or instead of, the charged offense at issue in the trial. However, courts in other jurisdictions have addressed the issue and rejected the argument that evidence of consciousness of guilt should be excluded in that circumstance.

A New York appellate court explained the rationale for allowing consciousness of guilt evidence even though it could relate to one or more uncharged offenses as follows: "It is common in cases of attempted flight to find that the defendant is charged with several crimes, or, at the time of flight, was guilty of some other offense . . . . To require as a matter of law that the admissibility of flight evidence depends on its unequivocal connection with guilt feelings over the particular crime charged would, therefore, operate to exclude such evidence from many cases in which it has always been regarded as admissible as a matter of course. No one disputes the general rule . . . that ambiguities or explanations tending to rebut an inference of guilt do not render flight evidence inadmissible but, rather, must be introduced as part of the defense and submitted to the jury. [Citation.] The suggested distinction [between flight evidence showing consciousness of guilt of a particular offense and flight evidence that possibly shows consciousness of guilt of an uncharged offense] would mean that only alternative *innocent* explanations of the flight are matters of rebuttal within the supposedly general rule, while . . . absolute exclusion [of flight evidence] is reserved for those who could show multiple guilt. We think there is obviously no justification for distinguishing in such a manner between an explanation urging that flight was not motivated by consciousness of guilt at all, and one which urges that it was prompted by consciousness of a different guilt. [Citation.] Such a distinction not only lacks support in the principles and theory of evidence, *but would create a practical preference in favor of persons who act from guilty reasons over those who act from innocent motives*. [¶] Lastly, we cannot assent to the argument that the

admission of this evidence unfairly places the defendant in the position of either disclosing to the jury his [other offenses] or of remaining silent while the jury weighs the fact of flight unenlightened by knowledge of the dual reason for his detention. It is for the defendant's benefit that he alone has the option whether to put the fact of [other offenses] before the jury as an explanation for his flight. If the alternative explanation is itself unsavory, and he chooses . . . not to disclose it, that does not disable the People from relying on that part of the truth (the unexplained flight) that is clearly a proper part of their evidence-in-chief. In short, the defendant's privilege to withhold evidence of [other offenses] is a shield, not a sword, and its exercise affords no good reason for complaint that the whole truth is not then before the jury." (*People v. Yazum* (1963) 13 N.Y.2d 302 [246 N.Y.S.2d 626, 196 N.E.2d 263, 264–265], italics added.) As another court observed, "It would seem inappropriate to hold evidence of [consciousness of guilt] inadmissible against an accused who was awaiting trial on various charges, and to admit such evidence against the accused who was charged with only one offense. Such procedure would reward the professional criminal and punish the neophyte." (*People v. Neiman* (1967) 90 Ill.App.2d 337 [232 N.E.2d 805, 809].)

An additional rationale for allowing the admission of such evidence is that "requiring the state to prove which crime caused a defendant to flee 'would place upon the State an impossible burden to prove that one charged with multiple violations of the law fled solely because of his consciousness that he committed one particular crime. *It is better logic to infer that the defendant, who is charged with several offenses, fled because of a conscious knowledge that he is guilty of them all.'* " (*State v. Kelly* (2001) 256 Conn. 23 [770 A.2d 908, 934], italics omitted, quoting *Fulford v. State* (1965) 221 Ga. 257 [144 S.E.2d 370, 371–372]; see also *Langhorne v. Commonwealth* (1991) 13 Va.App. 97 [409 S.E.2d 476, 480] [defendant cannot avoid the inferences the fact finder may draw from his actions showing consciousness of guilt because other charges were pending against him and he may also have been evading those charges]; *Barrientos v. State* (Fla.Dist.Ct.App. 2002) 825 So.2d 1065, 1067 ["The fact that a defendant has committed more than one crime within a short period of time does not preclude introduction of the evidence of flight where a sufficient evidentiary nexus exists to permit a jury to reasonably infer consciousness of guilt from the flight."]; *State v. Briggs* (1989) 17 Conn.App. 648 [554 A.2d 1112, 1116] [flight evidence was relevant and admissible even though the flight might have been due to defendant's consciousness of guilt on other charges because the time and place of the defendant's arrest tended in some degree to show flight from the crime at issue]; *Commonwealth v. Brousseau* (1996) 421 Mass. 647 [659 N.E.2d 724, 727] [evidence tending to

show consciousness of guilt will not be rendered inadmissible simply because it may reveal to the jury that the defendant committed another offense].)

■ We agree with the reasoning of these out-of-state decisions, particularly the reasoning that a defendant who has committed multiple offenses should not enjoy the benefit of the exclusion of relevant incriminating evidence that would be admissible against a "neophyte" who has committed only one offense. We conclude the court did not abuse its discretion in allowing the evidence of Ojito's SWAT standoff as probative of his consciousness of guilt. Although it is unnecessary to reach the issue, we further conclude that in light of the evidence of Ojito's actions immediately before and during the shooting of Barajas, and the evidence of his flight and disposition of the murder weapon immediately following the shooting, it is not reasonably probable that exclusion of the SWAT standoff evidence would have resulted in a more favorable verdict for Ojito on the murder charge. Accordingly, any error in the admission of the evidence was harmless.

## V. Evidence of Wilas Authored by Ojito's Cellmate

Ojito contends the court committed prejudicial error by admitting two notes (referred to as Wila 1 and Wila 2, respectively)[14] that were written by Miguel Thompson, an associate of the Mexican Mafia prison gang who shared a jail cell with Ojito after Ojito was charged with Barajas's murder. Police found Wila 1 in January of 2005 when they executed a search warrant and arrested Flores at his home on drug charges. Flores had received the note less than a week before the police found it. Wila 1 contains threats to prospective witnesses and their families and was translated to the jury as follows:[15] "Hey, comrades (friends/pals/buddies). This is Homie. The Homer Chore has specific instructions to relate to you dudes, and I ain't just bullshitting. If anyone decides to show up to make any statements in this upcoming trial, I will most definitely reach out and not only try to whack each and every one of you dudes, but I will go even further to reach your families. So just to make it specifically clear, the Homer Chore has my direct blessing to give you guys this message from Guero Yato Otay in the S.D.C.J. [San Diego County Jail]. And I will get out and will extend my full authority on everyone that goes against my word. I have soldiers all over the southeast area, so don't think I can't reach out and not touch a motha fucka. Everyone want to be tag banging, but then someone gets hurt or dissed, and you want to cooperate. Hell no. It ain't going down like that. So check your asses or

---

[14] A "wila" or "kite" is a note passed from a jail or prison inmate to another inmate.

[15] The translator explained that the words in parentheses are alternative translations.

else. Anyone from any tagging crew or hood plays that funny style shit will get a direct green light put on them, families and hood. Krew. You want to test my power, go for it. Don't say I didn't warn you dudes. Guero M, San Diego. Watch out (Beware)."

Wila 2 was confiscated on March 11, 2005, from a jail inmate who had received the note from Thompson. Wila 2 was translated to the jury as follows:

"Hey Mist. I don't know what's up, but check this out. Do you remember that kite that I wrote to Chore, that fucken [*sic*] dude turned it in or something because they are tripping in court that I'm doing or did you a favor on that. They trying to give me 25 to life for that shit. So if my attorney Gretchen goes over there, tell her that someone else wrote it, not us or me. Right when I was going to bounce, they come up with this bullshit. I go to court April 6, so do me that favor [or hook me up with that]. Oh, and you and Profe and Marcos, make sure you dudes say I was cuffed when that shit went down."

"[The back of the note read:] They got the kite. Make sure you tell Gretchen we don't have nothing to do with that and maybe a P.C. wrote it to smut us up. I wonder what the fuck. Fuck it. See what I'm telling you."

Ojito argues that Wila 1 standing alone should have been excluded under the general rule that evidence of an attempt by a third person to suppress evidence is inadmissible against a defendant when the attempt did not occur in the defendant's presence and the defendant did not authorize the attempt. (*People v. Williams* (1997) 16 Cal.4th 153, 200–201 [66 Cal.Rptr.2d 123, 940 P.2d 710] (*Williams*).) Ojito argues that Wila 2, which evidences Ojito's authorization of Wila 1, was key to the admissibility of Wila 1, but Wila 2 was inadmissible under California's hearsay rule (Evid. Code, § 1200), and the court's error in admitting it violated his rights under the confrontation clause of the Sixth Amendment to the United States Constitution.

 We conclude the court acted within its discretion in admitting Wila 1, because it was relevant for the nonhearsay purpose of showing why Flores and Cheech were afraid to testify.[16] " 'Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations.] Testimony a witness is fearful of retaliation similarly relates to

---

[16] Before ultimately deciding to testify, both Cheech and Flores were held in contempt of court and jailed for several days for refusing to testify out of fear of retaliation.

that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.' " (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 [37 Cal.Rptr.2d 596]; see *People v. Sapp* (2003) 31 Cal.4th 240, 281 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

Ojito contends Wila 1 was inadmissible under the following principles articulated in *Williams*: " ' " 'Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant.' " ' [Citation.] . . . [P]roof of a criminal defendant's 'mere opportunity' to authorize a third person to attempt to influence a witness 'has no value as circumstantial evidence' that the defendant did so." (*Williams, supra*, 16 Cal.4th at pp. 200–201.)

Assuming these principles articulated in *Williams* should have controlled the court's exercise of discretion as to whether Wila 1 was admissible, we find no abuse of discretion because the evidence shows more than "mere opportunity" on Ojito's part to authorize Wila 1. The evidence showed that Ojito and Thompson shared a jail cell during the time Wila 1 was written; the note was delivered to a key witness in this case (Flores); and Wila 2, which concerns Wila 1, begins with Thompson's nonhearsay greeting, "Hey Mist," which shows the note was addressed to Ojito. In light of this circumstantial evidence that Ojito authorized or even participated in the creation of Wila 1, the court reasonably could have admitted Wila 1 on the additional ground that, as evidence of an attempt to suppress evidence, it was relevant to show consciousness of guilt. (*Williams, supra*, 16 Cal.4th at p. 201.)

 We next consider whether Wila 2 contains inadmissible hearsay and, if so, whether its admission infringed Ojito's rights under the Sixth Amendment's confrontation clause. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) The statement in Wila 2 that "they are tripping in court that I'm doing or did you a favor on that" expressly asserts that "they are tripping in court"; it does not expressly assert that Thompson actually did Ojito the favor that others were "tripping" about in court. The statements, "[T]ell [Gretchen] that someone else wrote it, not us or me," and "Make sure you tell Gretchen we don't have nothing to do with that . . . ," are not factual

assertions; they are requests or directions to make particular representations to a third person. Requests and words of direction generally do not constitute hearsay. (*People v. Jurado* (2006) 38 Cal.4th 72, 117 [41 Cal.Rptr.3d 319, 131 P.3d 400] ["Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated."]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67 [132 Cal.Rptr. 848], quoted with approval in *Jurado*, at p. 117 [A declarant's " 'words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words' "].)

■ However, these statements reasonably can be viewed as *implied* hearsay. "[E]vidence of an express statement of a declarant is . . . hearsay evidence if such evidence is offered to prove—not the truth of the matter that is stated in such statement expressly—but the truth of a matter that is stated in such statement by implication." (*People v. Allen* (1976) 65 Cal.App.3d 426, 433 [135 Cal.Rptr. 276], disapproved on another point in *People v. Green* (1980) 27 Cal.3d 1, 9 [164 Cal.Rptr. 1, 609 P.2d 468].) "While the ultimate fact the statement is offered to prove is not the matter stated, the truth of the implied statement is a necessary part of the inferential reasoning process." (*People v. Morgan* (2005) 125 Cal.App.4th 935, 943 [23 Cal.Rptr.3d 224].) "An implied statement may be inferred from an express statement whenever it is reasonable to conclude: (1) that declarant *in fact intended* to make such implied statement, or (2) that a recipient of declarant's express statement would *reasonably believe* that declarant intended by his express statement to make the implied statement." (*People v. Allen, supra,* 65 Cal.App.3d at pp. 433–434.)

■ The implied hearsay assertions reasonably inferred from Wila 2 are that Thompson wrote Wila 1 as a favor to Ojito, and that Ojito requested, authorized or participated in the writing of Wila 1. The People suggest that Wila 2 was admissible under the declaration against penal interest exception to the hearsay rule set forth in Evidence Code section 1230. The problem with this suggestion is that "[t]he statement against interest exception allows admission only of those portions of the statement that are 'specifically disserving' to the declarant's interest." (*People v. Smith* (2005) 135 Cal.App.4th 914, 922 [38 Cal.Rptr.3d 1] (*Smith*), citing *People v. Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296].)[17] Thompson's statement in Wila 2 that he wrote "that kite" to "Chore" is disserving to his

[17] The United States Supreme Court observed that the declaration against penal interest "exception to the hearsay rule is 'founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.' [Citation.] However, this reasoning only applies to declarations within a confession that are individually self-incriminatory and not to statements that are collateral to them. 'The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory

interest, but the statements implying that Ojito authorized or participated in the writing of Wila 1 are not; they are disserving to *Ojito's* penal interest.

■ Assuming the court erred in admitting Wila 2, we conclude the error was under state law only, and did not implicate the Sixth Amendment's confrontation clause. The Sixth Amendment's confrontation clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." In *Crawford, supra*, 541 U.S. at pages 53–54, the United States Supreme Court held that the confrontation clause bars "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (Italics added.) *Crawford* implied that the Sixth Amendment does not bar the admission of *nontestimonial* hearsay, stating: "[N]ot all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them. [¶] The text of the Confrontation Clause reflects this focus. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." (*Crawford, supra*, 541 U.S. at p. 51.)

■ In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), the Supreme Court directly addressed the issue of "whether the Confrontation Clause applies only to testimonial hearsay . . . ." (*Id.* at p. 823.) Considering whether statements made to law enforcement personnel during a 911 call and at a crime scene were testimonial, *Davis* clarified that "the Confrontation Clause applies only to testimonial hearsay." (*Ibid.*) *Davis* explained: "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It

parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.' " (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 329 [68 Cal.Rptr.2d 61], quoting *Williamson v. United States* (1994) 512 U.S. 594, 599–600 [129 L.Ed.2d 476, 114 S.Ct. 2431].)

is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Id.* at p. 821.) Thus, *Davis* expressly held what *Crawford* suggested—that "nontestimonial hearsay is not subject to the Confrontation Clause." (*U.S. v. Tolliver* (7th Cir. 2006) 454 F.3d 660, 665, fn. 2; see *People v. Cage* (2007) 40 Cal.4th 965, 984 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*) ["the confrontation clause is concerned solely with hearsay statements that are testimonial . . ."].)

Accordingly, after *Davis*, the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial. If the statement is testimonial, it must be excluded unless the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine the declarant. If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule.

Testimonial statements are "statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing and proving facts for possible use in a criminal trial." (*Cage, supra*, 40 Cal.4th at p. 984, fn. 14, original italics.) An "informal statement made in an unstructured setting" generally does not constitute a testimonial statement. (*People v. Morgan* (2005) 125 Cal.App.4th 935, 947 [23 Cal.Rptr.3d 224].) Thompson's implied hearsay statements in Wila 2 clearly were not testimonial. Consequently, their admission into evidence does not implicate Ojito's rights under the confrontation clause.

Ojito cites *Smith, supra*, 135 Cal.App.4th 914, for the proposition that "[f]or nontestimonial statements . . . , *Crawford* left undisturbed the standard previously set forth in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] (*Roberts*). [Citations.] [¶] Under *Roberts*, admission of a hearsay statement does not violate the confrontation clause if the statement 'bears adequate "indicia of reliability," ' that is, if it either 'falls within a firmly rooted hearsay exception' or is cloaked with 'particularized guarantees of trustworthiness.' " (*Smith, supra*, 135 Cal.App.4th at p. 924.)

However, *Smith* was decided before *Davis* clarified that the confrontation clause applies only to *testimonial* hearsay and is not implicated by nontestimonial hearsay. After *Davis*, the *Roberts* test used in *Smith* is inapplicable. As the California Supreme Court noted in *Cage*: "[T]he [United States Supreme Court] has made clear that *Roberts* . . . and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause. As the court

indicated in *Davis*, '[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, *is not subject to the Confrontation Clause.*' [Citation.] Thus, there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution." (*Cage, supra*, 40 Cal.4th at p. 981, fn. 10, citation omitted, italics added by *Cage*; see also *U.S. v. Williams* (2d Cir. 2007) 506 F.3d 151, 156 [following *Davis* the *Roberts* reliability analysis plays no role in confrontation clause inquiry].)

Because any error in the admission of Wila 2 was state law error under California's hearsay rule, we consider whether it is reasonably probable that Ojito would have obtained a more favorable verdict if the court had excluded Wila 2. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) Considering the other evidence of Ojito's consciousness of guilt, including the evidence of his flight and disposition of the murder weapon and the SWAT standoff evidence, and the evidence of his actions at the scene of the crime supporting the finding that he aided and abetted Barajas's murder, we conclude it is not reasonably probable that the exclusion of Wila 1 or Wila 2 or both would have resulted in a different outcome at trial.[18]

## VI. *Error in Abstract of Judgment*

Ojito points out, and the People concede, that Ojito's abstract of judgment incorrectly identifies Penal Code section 12022.53, subdivision (d), as the provision for his gun enhancement, and that the correct provision is Penal Code section 12022, subdivision (a)(1). We will direct the superior court to amend the abstract of judgment accordingly.

## GARCIA'S APPEAL

### I. *Denial of Motion to Sever Trials*

Garcia contends the denial of his motion to sever his trial from Ojito's trial deprived him of his constitutional right to due process of law. Specifically, he argues the denial of trial severance resulted in *Aranda/Bruton* error because Ojito made incriminating statements that the jury may have considered in determining his (Garcia's) guilt. He also argues the joint trial resulted in "prejudicial association" of him with incriminating evidence concerning Ojito, including evidence that he and Ojito had been "best friends" since childhood and cofounded TNS, photographs of Ojito holding guns and

---

[18] Because we reject all of Ojito's claims of substantive error, we necessarily reject his claim of cumulative error.

throwing gang signs and showing Ojito's gang-related tattoos, testimony of police gang experts, and the evidence regarding Ojito's arrest following a SWAT standoff. Garcia contends a severance should have been granted due to the high likelihood of the jury confusing which evidence could be considered as to which defendant.

We conclude the court did not prejudicially err in denying Garcia's motion and requests for trial severance. Garcia cannot show *Aranda/Bruton* error because, as the People point out, there is no evidence in the record that Ojito made any extrajudicial statements that incriminated Garcia. The court did not abuse its discretion in admitting the gang-related evidence because that evidence was admissible as to both Ojito and Garcia to show motive and intent. (*People v. Gonzalez, supra*, 126 Cal.App.4th at p. 1550.)

 Although the evidence of Ojito's arrest following a SWAT standoff would not have been admitted in a separate trial of Garcia, the court instructed the jury that the evidence was offered only as to Ojito and not as to Garcia.[19] "Jurors are routinely instructed to make . . . fine distinctions concerning the purposes for which evidence may be considered, and we ordinarily presume they are able to understand and follow such instructions. [Citation.] Indeed, [courts] have described the presumption that jurors understand and follow instructions as '[t]he crucial assumption underlying our constitutional system of trial by jury.' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

In any event, in light of the overwhelming evidence that Garcia fatally shot Barajas and the shooting was premeditated, we are satisfied beyond a reasonable doubt that Garcia would not have obtained a more favorable result if he had been tried separately from Ojito. Accordingly, we conclude that any error in the denial of Garcia's motion for severance was harmless.

## II. *Gang Evidence and Wilas*

Garcia contends he was denied a fair trial by the admission of highly inflammatory evidence—specifically, the admission of evidence concerning gangs and gang activities, including the testimony of the police gang experts, and the admission of Wila 1 and Wila 2.[20] This contention essentially is a continuation of Garcia's argument that the denial of his severance motion deprived him of a fair trial because of the admission of gang-related evidence against Ojito.

---

[19] The court also instructed the jury in accordance with CALCRIM No. 304 as follows: "I instructed you during the trial that certain evidence was admitted only against a certain defendant or certain defendants. You must not consider that evidence against any other defendant."

[20] Garcia "specifically invokes" Ojito's arguments regarding the admissibility of the wilas.

As we discussed above, we conclude the gang-related evidence and gang expert testimony in question was properly admitted, and, in any event, its admission was harmless beyond a reasonable doubt as to Garcia. We conclude the admission of Wila 1 and Wila 2 was likewise harmless beyond a reasonable doubt as to Garcia in light of the overwhelming evidence supporting his conviction, and the fact that the notes concerned Ojito and did not implicate Garcia. The jury was specifically instructed to consider the wilas against Ojito only, and we presume the jury understood and followed that instruction. (*People v. Yeoman, supra,* 31 Cal.4th at p. 139.) The admission of the gang-related evidence and the wilas did not deprive Garcia of a fair trial.

### III. *Autopsy Photographs*

Garcia contends the court abused its discretion under Evidence Code section 352 by admitting autopsy photographs of Barajas. Garcia filed a motion in limine to exclude the autopsy photographs on the ground they are gruesome and inflammatory.

■■■ "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect." (*People v. Crittenden* (1994) 9 Cal.4th 83, 133–134 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

We conclude the autopsy photographs were relevant to the manner in which Barajas was killed and admissible to assist the jurors in understanding the medical testimony about the autopsy. (See *People v. Roldan* (2005) 35 Cal.4th 646, 713 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 311 [190 Cal.Rptr. 211].) Even if the photographs were cumulative to the medical testimony about the autopsy, "this . . . does not demonstrate the trial court abused its broad discretion. '[P]rosecutors . . . are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.' " (*People v. Roldan, supra,* 35 Cal.4th at p. 713.)

We have reviewed the photographs and find them unpleasant, but not unduly shocking, gruesome, or inflammatory. The photographs are clinical in appearance, consisting of closeup shots of the bullet wounds on the body. None of the photographs depicts the victim's face or entire body. The court did not err in admitting the autopsy photographs.

## DISPOSITION

The judgments are affirmed. The superior court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment for Geraldo Ojito specifying an enhancement under Penal Code section 12022, subdivision (a)(1), rather than Penal Code section 12022.53, subdivision (d).

Haller, Acting P. J., and Irion, J., concurred.

On November 24, 2008, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied February 18, 2009, S169308. George, C. J., did not participate therein.