Filed 11/26/13  P. v. Smith CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAYSHAWN DONTAY SMITH,<br><br>Defendant and Appellant. | C070118<br><br>(Super. Ct. No. 11F00756) |

A jury found Rayshawn Dontay Smith guilty of four counts of robbery, single counts of attempted robbery and possession of a loaded, concealed, unregistered firearm and sustained an allegation of personal use of a firearm.  The trial court sentenced defendant to 20 years eight months in state prison.

On appeal, defendant contends the trial court erred in admitting evidence of third parties' attempts to change the testimony of a witness.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On December 30, 2010, just before 1:00 p.m., someone knocked on Danielle Davis's apartment door.  Thinking it was her ride, she opened the door to find defendant,

1

who pushed his way in and asked if Eric was there. Defendant's hair was in dreadlocks and he wore a distinctive looking jacket. He put a gun to the back of Davis's head and told her to show him where the money was or he would blow her head off.

Davis walked into her bedroom; defendant followed and dumped out the contents of her purse. He opened her makeup bag and looked for money. Finding none, defendant told Davis, "Have a nice day," and left the apartment.

Davis called the police after defendant left. She identified defendant as the perpetrator in a photographic lineup and at trial. She also identified a photograph of defendant's handgun as the weapon used in the crime. Defendant's fingerprint was found inside Davis's makeup bag.

On December 30, 2010, Vincente Tafolla stopped at a market on his way home to buy sodas and beer. As he talked to a man before entering the store, two men approached. One of the men pulled out a gun and demanded Tafolla's wallet, threatening to kill him if he moved. The other man, whose long hair was in "braids," took Tafolla's wallet, which had about $30 to $40, identification, and credit cards. As the two men left, Tafolla noted one of them wore a distinctive jacket. At trial, he identified a jacket belonging to defendant as looking like the one worn by one of the robbers.

Later that day, at around 9:00 p.m., Evan Xiong and his friend Jimmy were sitting in Jimmy's car, which was parked in front of Xiong's apartment. A red Kia pulled up behind them; a man got out of the Kia and ran toward a nearby liquor store while keeping his hands under his shirt. Suspicious, Xiong wrote down the Kia's license plate number. A few minutes later, Xiong got out of Jimmy's car and Jimmy drove off.

Xiong saw the man from the Kia and another man running from the liquor store with their hands under their shirts. One man got in the Kia and started it. The other man ran up to Xiong, put a gun in his face, and threatened to kill him if he did not give up his wallet. Xiong gave up his wallet, which contained $150 and other items. The robber then got into the Kia, which drove off.

2

Xiong told police the man who robbed him wore a beanie, was slim, tall, had a gold "grill" on his teeth, and used a revolver. Xiong gave the police the license plate number of the Kia, but could not identify any suspects at a field showup. At trial, Xiong identified a photograph of defendant's gun as being similar to the one used by the robber.

On January 2, 2011, at around 6:00 p.m., Sasha Divens, who was seven months pregnant, was driving down Center Parkway with her friend Manalina Hilbert. When the car ran out of gas, Divens tried to call her husband, opening the door slightly to activate the interior light. As Divens contacted her husband, she was met by defendant and another man. Defendant had shoulder length dreadlocks and wore a distinctive jacket. He pointed a gun at her head while the other man demanded money.

When Divens responded that she had no money, the other man took the gun from defendant, went to the other side of the car, and confronted Hilbert. The man grabbed Hilbert from the car and went through her pockets, taking about $500 and her car keys. Defendant sat on Divens's lap and went through her pockets, taking her identification and between $400 to $500. When the robbers were leaving, defendant returned Divens's identification and the other man threw back Hilbert's keys. Divens identified defendant in a photographic lineup, and identified his jacket and a photograph of the gun he used. Hilbert looked at a photographic lineup and thought defendant's picture looked like one of the robbers.

Detectives determined that defendant's girlfriend, Andrea Harris, owned the Kia used in the Xiong robbery. Defendant was contacted at his apartment, which was about a half-mile from the Tafolla robbery, one and one-half to two miles from the Divens and Hilbert robberies, and 200 to 300 yards from the attempted robbery of Davis. A search of defendant found a loaded .38-caliber revolver in his pocket. He was not the registered owner of the gun. The distinctive jacket identified at trial was found in his car.

Dr. Scott Fraser, an expert on eyewitness testimony, testified for the defense that dimmer lighting reduces a person's ability to see details. The lighting in Divens's car

3

was dim and the robber's face was in the shadows, making it more difficult to see his features.  The difficulty of an accurate identification rises with the number of people in an incident.  High stress situations, like being in the presence of a weapon, reduces the accuracy of identification.

On the last day of prosecution testimony, the prosecutor informed the trial court he wished to introduce portions of a jailhouse phone call between defendant and his girlfriend referring to efforts to get a witness to change her testimony.  Defense counsel objected to admitting the phone call.  The trial court overruled the objection, finding the evidence was probative of defendant's state of mind.

The audiotape of the February 16, 2011, phone call was played to the jury. Defendant, talking to his girlfriend about a notarized letter, asks her to, "handle that for me, and then I come home.  Cause, the, the other one they talkin' 'bout with the, ah, with the pregnant lady?"  Defendant continues, "They, they in statements you can tell, they don't know, you know, it look like him and all type of shit.  You can tell that's, that ain't go---, that's gonna fold.  But this one, you know, it's more, you know---[.]"

After the girlfriend replies, "Yeah," defendant says:  "--- So baby, I really need you to handle that for me, you know?  Whatever, you know, car, money, you know, but just ask first, just see where her head is first and then --  [¶]  -- you know, he got a son, you know it a mis -- woo, woo, woo, you gonna know what to say.  So, I put everything on there with on, on how to network it and, you know, and it's 585, you know what I mean by that?"  Defendant's girlfriend asked what 585 meant, and defendant told her, "The apartment number."  The girlfriend then told defendant the police already told her what apartment it was and she told them she had never been there.

Later, defendant said, "So that, you know, so I really need, need, need y'all to really network that for me, okay baby?"  When the girlfriend replied, "Okay," defendant told her, "You know that I really don't wanna ah, really talk over the phone about, what, what's going on, so, you know that, I'm I'm glad you received a letter and I was basically

4

letting you know, you know, what to do, okay?" Defendant's girlfriend replied, "Okay, we don't have to talk about this no more." Defendant said it was good that she understood, and the call ended.

The prosecutor recalled Davis after the tape was played. She testified to receiving a call in March from a person named Scooter who claimed to be defendant's mother. Prior to the call, Davis had learned that Scooter was the name of defendant's mother. After the trial court instructed the jury that this testimony was "not being offered for the truth of the matter asserted," Davis testified that this woman said she was willing to pay Davis to change her story. She also told Davis that defendant had a son, and if he was in jail she would have to raise the boy. Davis declined the offer.

In April, shortly after Davis's birthday, two women knocked on Davis's door. One woman identified herself as defendant's cousin and the other as defendant's girlfriend. The cousin told Davis defendant's aunt would pay her to change her story. Davis declined this offer as well.

## DISCUSSION

Defendant contends the decision to admit Davis's testimony on attempts to influence her was prejudicial error. He claims the testimony was inadmissible hearsay, there was an insufficient nexus between it and the recorded jail call, and the testimony violated his right to confrontation. We disagree.

Defendant asserts Davis's testimony regarding the two offers to change her testimony was relevant only if the jury considered the out-of-court statements from defendant's mother and cousin asking Davis to change her testimony for the truth of what was said in them. Since there was no hearsay exception under which these statements could be admitted, defendant claims they were wrongly admitted by the trial court.

A statement constitutes hearsay if it was made other than by a witness while testifying at trial and is offered to prove the truth of the matter stated. Hearsay evidence

5

is inadmissible unless it falls within one of the exceptions to the rule. (Evid. Code, § 1200, subds. (a), (b).)

Requests and words of direction typically are not hearsay. (*People v. Jurado* (2006) 38 Cal.4th 72, 117 ["Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated"]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67, quoted with approval in *Jurado*, at p. 117 ["A declarant's words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words"].) One exception is if the request includes implied hearsay, that is " 'if such evidence is offered to prove--not the truth of the matter that is stated in such statement expressly--but the truth of a matter that is stated in such statement by implication.' [Citation.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289.)

The alleged hearsay statements are requests from the declarants for Davis to change her testimony. They are offered not for the truth of the matters asserted, that Davis would get paid if she changed her story. Instead, they are admissible as circumstantial evidence that defendant wanted Davis to change her story, and therefore change her testimony, to a version that would exculpate him. Defendant's efforts to get Davis to change her testimony are admissible for the nonhearsay purpose of proving his guilty state of mind.

Defendant's claim that there is an insufficient nexus between the third party efforts to influence testimony and the taped jail call is likewise misplaced.

" ' " 'Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant.' " ' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 153, 200.) Defendant claims that since there is not even the suggestion that defendant had the " 'mere opportunity' " to tell

6

his mother and cousin to influence Davis, the People did not establish adequate foundation for Davis's testimony.

The phone call shows defendant wanted his girlfriend to get the person in the apartment to change her testimony. Since the attempted robbery of Davis was the only charged crime taking place in an apartment, defendant's request referred only to influencing Davis's testimony. Defendant did not expect his girlfriend to do this alone; he told her to "network it." In March, after the February 16 phone call, defendant's mother called in an attempt to influence Davis's testimony. Defendant's cousin and girlfriend came to Davis's apartment the following month and tried to get Davis to change her testimony. The evidence shows the girlfriend followed defendant's instructions and networked, getting defendant's family members to help her efforts to change Davis's testimony. This circumstantial evidence provides a sufficient nexus to admit Davis's testimony as evidence of defendant's efforts to change her testimony about his crime.

Defendant's right to confrontation claim merits little consideration. The right to confrontation is violated only when the admitted out-of-court statement is testimonial. (*People v. Geier* (2007) 41 Cal.4th 555, 597.) The offers for Davis to change her testimony are not testimonial, so their admission does not implicate the right to confrontation.

DISPOSITION

The judgment is affirmed.

      ROBIE      , Acting P. J.

We concur:


      BUTZ      , J.


      HOCH      , J.

7