Filed 9/1/22  P. v. Hildahl CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079016 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD107630) |
| RICHARD DWAYNE HILDAHL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Recent amendments to California's homicide statutes significantly limit the circumstances in which a defendant who did not actually kill the victim can be convicted of murder. Former Penal Code section 1170.95 (now § 1172.6)[1] provides an avenue for those convicted before these statutory changes became effective to receive the benefits of the new legislation.

Richard Dwayne Hildahl invoked section 1172.6 in seeking to vacate his first degree murder conviction from 1995, claiming he could not be convicted of murder under existing law. Because his petition made a prima facie showing of entitlement to relief, he was afforded an evidentiary hearing. At that hearing, the court, acting as an independent factfinder, concluded that he was still guilty beyond a reasonable doubt of first degree murder under the current statutes.

Hildahl appeals that order, arguing: (1) there was insufficient evidence to support a finding beyond a reasonable doubt that he would still be convicted of first degree murder, and (2) the trial court impermissibly considered the original appellate opinion and jury's verdicts from his trial. As we explain, we find that there is sufficient evidence to support the trial court's ruling. And although the trial court briefly mentioned the appellate opinion and jury verdicts in its discussion with counsel, its *analysis* reflected no consideration of inappropriate or inadmissible evidence. Accordingly, we affirm the order denying relief.

---

[1] Undesignated statutory references are to the Penal Code. Effective June 30, 2022, section 1170.95 was renumbered without substantive change to section 1172.6. (See Legis. Counsel's Dis., Assem. Bill No. 200 (2021–2022 Reg. Sess.) Stats. 2022, ch. 58, § 10.) We cite to the current version, section 1172.6.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1993, Deserie LaBastida hosted a party at her home in Clairemont. Hildahl, Phillip S. (a minor), Alex Ponce, Wiebe DeBoer, Ian Duarte, and Hector Peterson were among the attendees. They drank alcohol, smoked marijuana, and snorted methamphetamine.

During the party, LaBastida said that her friend, Michelle D., had "a large sum" of money and was showing it off the night before. Someone suggested that Michelle also had guns. Hildahl proposed that they rob Michelle, and they ultimately decided they would use Phillip's gun to accomplish their plan. Either Phillip or Hildahl repeatedly asked Peterson for a ride to Michelle's house. Peterson reluctantly agreed and, after driving Hildahl, LaBastida, and Phillip S. to Michelle's house, returned to the party alone.

Around 3:30 a.m., LaBastida and Hildahl went to Michelle's apartment while Phillip S. waited outside. Michelle was not home, but her ex-husband Charles let them into the apartment. LaBastida went into Michelle's room, supposedly looking for a pencil and paper, and left a note saying they had dropped by. Although the precise details of how they found Michelle and how the initial robbery took place are unclear, what followed was supported by testimony from multiple witnesses.

Approximately 90 minutes after leaving the party, Hildahl, LaBastida, and Phillip returned in Michelle's car.[3] LaBastida entered first and told

<hr>

[2]    Because Hildahl challenges the sufficiency of the evidence, the facts are recited in the light most favorable to the prosecution. (See *People v. Williams* (2020) 57 Cal.App.5th 652, 663 (*Williams*).)

[3]    Hildahl's primary defense was that he was not involved in the robbery, kidnapping, torture, or murder of Michelle. Phillip, the main defense

3

everyone to turn off the lights and cover their faces because Michelle was with them.  Ponce and DeBoer crouched in the corner.  Phillip and LaBastida brought Michelle into the house with a beanie over her head and her hands tied behind her back.  Phillip pushed her up against a bookshelf, breaking her necklace, and then put her on the couch with Hildahl's help.

The three of them repeatedly demanded money from Michelle, threatened her, called her a "bitch," and punched her.  Phillip pointed a gun at Michelle.  Hildahl beat her after saying they were going to find her family and kill them.  Michelle was crying and asking why they were doing this to her.  One of the men gave her a line of methamphetamine.  Hildahl told Michelle, "I want you to suck my homie's dick," but Michelle repeatedly refused.  After a while someone said, "[S]ee, you can never tell anybody we weren't nice to you."  Then Ponce, who at this point had moved to the kitchen, testified he heard laughter from some of the girls at the party as if they had "come out of the room and seen something."

The beating and threats continued for hours.  Hildahl came into the kitchen and said that Michelle didn't have any money, but they couldn't release her because she would tell the police what they had done, so they had to kill her.[4]  Phillip dragged Michelle into the bedroom by her feet and strangled her with a rope.  Hildahl then announced to the group, "[I]t is

_____

witness, plead guilty to murdering Michelle, and claimed DeBoer, not Hildahl, was his accomplice.

[4]     In the preliminary hearing, DeBoer testified that Hildahl and Phillip were talking together in the hallway when Hildahl suggested they had to kill Michelle.  However, the trial testimony was less clear.  Ponce testified that Hildahl told him they would have to kill Michelle in the kitchen, but made no indication that Phillip was present at the time of the statement.

done." He discussed with Phillip and LaBastida what to do with Michelle's purse and her body.

LaBastida got some window cleaner and towels, which Hildahl and Phillip used to wipe down the car to remove fingerprints. Hildahl and Phillip went back into the house; Hildahl told Ponce to close his eyes because they were going to bring the body out. As they carried Michelle through the living room wrapped in a sheet, it became apparent that she was still alive. Hildahl and Phillip placed Michelle in the trunk of her car and returned to the house to discuss what to do. Phillip went back outside and stabbed Michelle in the neck.

Returning to the house with blood on his hands, Phillip said, "Don't nobody move, don't nobody touch me." After washing the blood off, Phillip and Hildahl left in Michelle's car. Phillip testified that they drove looking for somewhere to burn the car but couldn't find any secluded place.

When a police car pulled up two cars behind them, Phillip abandoned the plan and drove to Landeros's house instead. They arrived there around 6:00 or 7:00 a.m. Landeros awoke to the men throwing Michelle's purse, her jacket, and a blanket through his first floor bedroom window. Hildahl and Phillip told Landeros that they needed him to get rid of the items because they had killed someone. Initially, Landeros did not believe them, so they showed him Michelle's body in the trunk, tied up by her legs and wrists. Hildahl warned, "Don't say nothing." The men asked Landeros to help dispose of the car, but he refused.

After leaving Landeros's apartment, Hildahl and Phillip wiped the car down and abandoned it at an apartment complex. Later, they told Ponce and Peterson that Michelle was not dead when they left LaBastida's apartment

5

and they could hear her kicking in the trunk. Hildahl joked about how they could hear "kick, gurgle, kick, kick, gurgle, gurgle" from the trunk.

A few days later, San Diego police found Michelle's bound and blood-stained body in the trunk of her car. She had four stab wounds to the neck, one of which severed her jugular vein. Overall, she had more than 35 wounds. She died from a combination of strangulation and stab wounds to the neck.

A jury found Hildahl guilty of first degree murder (§ 187, subd. (a)), and for that offense he was sentenced to 25 years to life in prison.[5] This court later affirmed his convictions. (*People v. Hildahl* (Nov. 4, 1997, D026525) [nonpub. opn.].)

More than 20 years later in 2019, Hildahl filed a section 1172.6 petition for resentencing with the superior court claiming he could no longer be convicted of first degree murder under changes made to sections 188 and 189 effective January 1, 2019. The petition stated he could not be currently convicted because he: (1) was not the actual killer, (2) did not aid and abet the actual killer in the commission of the crime with intent to kill, and (3) was not a major participant in the underlying felony who acted with reckless indifference to human life. The trial court issued an order to show cause, received additional briefing, and held an evidentiary hearing. After hearing arguments from counsel it denied the petition, finding beyond a reasonable doubt that Hildahl was guilty of murder as either a direct aider and abettor who acted with the intent to kill, or alternatively as a major participant in a felony murder in which he acted with reckless indifference to human life.

---

[5] Hildahl was also convicted of conspiracy to commit robbery (§§ 182, subd. (a)(1), 211), kidnapping during a carjacking (§ 209.5, subd. (a)), kidnapping to commit robbery (§ 209, former subd. (b)), torture (§ 206), and robbery (§ 211).

6

DISCUSSION

A.    *Section 1172.6 Framework*

Effective January 1, 2019, Senate Bill No. 1437 amended the felony-murder rule by adding section 189, subdivision (e).  It provides that a participant in the qualifying felony is liable for felony murder only if the person:  (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life.  (See *People v. Gentile* (2020) 10 Cal.5th 830, 842.)  The Legislature also amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.)

Under section 1172.6, persons convicted of felony murder or murder based on the natural and probable consequences doctrine may petition the sentencing court to vacate their convictions and be resentenced on any remaining counts if they could not have been convicted of murder because of these statutory changes.  (See *People v. Lewis*, 11 Cal.5th 952, 959–960 (*Lewis*).)  A section 1172.6 petition must show that:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, . . . (2) [t]he petitioner was convicted of murder . . . following a trial . . . [,] [and] (3) [t]he petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(1)–(3).)

7

Where, as here, the petition states a prima facie case for relief, the superior court is required to conduct a hearing under subdivision (d)(1) of section 1172.6.  At the hearing, the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is ineligible for resentencing. (§ 1172.6, subds. (c), (d)(1)–(3); see *Lewis*, *supra*, 11 Cal.5th at p. 960; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984.)  "If the prosecution fails to sustain its burden of proof, the prior conviction . . . shall be vacated and the petitioner shall be resentenced on the remaining charges."  (§ 1172.6, subd. (d)(3); see *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 249.)

At the time of the hearing in this case, the parties could "rely on the record of conviction" or "offer new or additional evidence to meet their respective burdens."  (Former § 1170.95, subd. (d)(3), added by Stats. 2018, ch. 1015 (Sen. Bill No. 1437) § 4, eff. Jan. 1, 2019.)  Former section 1170.95, subdivision (d)(3) was subsequently amended by Senate Bill No. 775.  (Stats. 2021, ch. 551, § 2.)  On June 30, 2022, the statute was renumbered and amended to section 1172.6, which now states:

> "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3), as amended and renumbered by Stats. 2022, ch. 58 (Assem. Bill No. 200) § 10.)

8

B.     *The Amendment to Former Section 1170.95, Subdivision (d)(3) Is Retroactive*

Hildahl's evidentiary hearing took place in 2021.  The amendments in Senate Bill No. 775 did not become effective until January 1, 2022.  Citing *In re Estrada* (1965) 63 Cal.2d 740, at pages 744 to 745, Hildahl contends that these amendments apply retroactively and thus prohibited the trial court from considering the prior appellate opinion (apart from procedural history) and the jury's verdicts.  In contrast, the Attorney General maintains that the evidentiary restrictions do not apply retroactively because the process itself is a procedural mechanism and not part of the original judgment, which is already final.

In *People v. Basler* (2022) 80 Cal.App.5th 46, a different panel of this court held that Senate Bill No. 775 applies retroactively to defendants whose cases are not yet final.  (*Basler,* at p. 56; see also *People v. Porter* (2022) 73 Cal.App.5th 644, 652.)  Discerning no compelling reason to depart from *Basler*, we agree with Hildahl that the changes made in former section 1170.95 subdivision (d)(3) by Senate Bill No. 775 apply in his case.  (See *People v. Bolden* (1990) 217 Cal.App.3d 1591, 1598.)

C.     *Substantial Evidence Supports the Trial Court's Finding that Hildahl is Ineligible for Relief Under Section 1172.6*

Hildahl contends that the evidence is insufficient to prove first degree murder on either an aiding and abetting or felony murder theory.  As to the former, he contends that because LaBastida was the one who mentioned that Michelle had money, she directed the robbery.  Moreover, Hildahl points out that Phillip is the one who strangled Michelle, and there is no evidence that Hildahl stabbed her afterwards or supplied any of the weapons.

These are all reasonable arguments to make to a trial court.  But on appeal from an order denying a petition under section 1172.6, we review the

9

trial judge's factfinding for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) The test is not whether we believe the People met their burden of proving beyond a reasonable doubt that Hildahl is ineligible for resentencing, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

> "The record must disclose substantial evidence . . . —i.e., evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [trial court] could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony . . . subject to justifiable suspicion do not justify the reversal of a judgment.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### 1. *Direct Aiding and Abetting First Degree Murder*

An aider and abettor is considered a principal in the crime. (§ 31.) "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Factors to consider when determining whether a person aided and abetted the commission of a crime " 'include presence at the scene of the crime, failure to take steps to attempt or prevent the commission of the crime, companionship, flight, and conduct before and after the crime.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

Here, the trial court found that "[t]he evidence at trial clearly shows [Hildahl] was intricately involved in each stage of the planning and the

10

killing of the victim." Substantial evidence supports this determination. Hildahl was the architect of the plan to rob Michelle. He helped transport her to the house, demanded money from her, participated in beating her, and ordered Michelle to orally copulate one of his cohorts. Hildahl is also the one who said they had to kill Michelle to prevent her from going to the police. This evidence alone would support a finding he had the requisite intent to kill. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 [intent to kill may be inferred from the defendant's acts and circumstances of the crime].)

Evidence of Hildahl's conduct after Michelle was strangled further supports the trial court's conclusion that he aided and abetted the murder. (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 273.) Believing Michelle was dead, Hildahl announced, "It is done"—and when to his apparent surprise Michelle was still alive, Hildahl discussed with Phillip what to do next, and was in a position where he could have seen and heard Phillip stab Michelle in the neck. After carefully considering the evidence, the trial court stated, "to me, that is textbook direct aiding and abetting of premeditative murder." We agree. Taken together, these facts support the trial court's finding that Hildahl knew and shared Philip's intent to commit the murder, and he engaged in conduct to achieve that goal.

In asserting otherwise, Hildahl argues there is insufficient evidence Phillip heard him say that Michelle needed to be killed, and in any event it cannot be concluded beyond a reasonable doubt that he encouraged Phillip to kill Michelle. But as an appellate court, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) "[I]t is the exclusive province of the trial judge . . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*Ibid.*) Here, the trial court

determined that the evidence showed Hildahl's "intent to kill" and that he was "obviously directing [Phillip] as to what to do." These are reasonable inferences from the evidence that we do not second guess. (See *Williams*, *supra*, 57 Cal.App.5th at p. 663 [we presume in support of the order facts the superior court could reasonably have deduced from the evidence].)

2. *Major Participant Felony Murder*

Substantial evidence of either theory found true by the trial court would require that we affirm the court's order denying Hildahl's petition. But even if we determined that the direct aiding and abetting theory was insufficiently supported, we would still be obligated to affirm based on the felony murder theory if there was substantial evidence that Hildahl was a major participant in the robbery who acted with reckless indifference to human life. Two cases are central to the analysis of these requirements: *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

In the last decade, the Supreme Court has substantially narrowed the meanings of the terms "major participant" and "reckless indifference to human life" as they appear in section 190.2, subdivision (d) and were more recently incorporated into section 189, subdivision (e)(3). The court held in *Banks* that to assess whether a defendant's participation in activities known to carry a grave risk of death was sufficiently significant to be deemed "major," courts must consider the defendant's role in planning the criminal enterprise and supplying or using lethal weapons; defendant's awareness of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the participants; whether the defendant was at the scene of the killing, in a position to facilitate or prevent the actual murder, and by action or inaction played a particular role in the death; and what the

12

defendant did after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) As the court explained in *Clark*, similar factors, both subjective and objective, inform whether a defendant acted with reckless indifference to human life, including a defendant's knowledge that weapons would be used and/or personal use of weapons; his or her knowledge of an accomplice's propensity to kill; the defendant's physical presence at the scene and opportunity to restrain the killer or aid the victim; any efforts taken to minimize the risk of violence in committing the felonies; and the duration of the felony. (*Clark, supra*, 63 Cal.4th at pp. 618–623.)

The trial court thoroughly analyzed each of these factors and concluded that Hildahl was both a major participant in the robbery and acted with reckless indifference to Michelle's life. For example, the trial court observed:

> "[W]hat role did [Hildahl] have in planning the enterprise[?] As I've indicated, critical role. [']Let's rob her. We've got to kill her. Here's how we're going to do it. Let's get rid of the evidence. Let's wipe down the car,['] et cetera. [¶] . . . [¶]

> "What awareness did he have of the particular danger posed by the nature of this crime? He was well aware of his co-defendant, [Phillip]. He was right there with him throughout all of these activities. . . . [¶]

> "[W]as he present at the scene of the killing, in a position to facilitate or prevent the actual murder? . . . [H]e was there every second of this multiple-hour torture of the victim. [¶]

> "Did his own actions or inactions play a particular role? Absolutely. . . . [A]ll of these witnesses are saying it was primarily [Hildahl] who was directing the actions, and then [Phillip] carried them all out. . . . [¶]

> "[W]hat did [Hildahl] do after the lethal force was used? . . . [T]hat was . . . pretty calculated . . . dragging her out to the car, getting her in the trunk, stabbing her. [Phillip] did the stabbing, but it was both of them together: [']She's not dead. We've got to make sure she's dead.['] [¶]

13

"Getting rid of her purse, her various items, her car, all of these things were factors showing that [Hildahl] had a very important role in every stage of this murder. . . . [¶]

"And then when we look at . . . reckless indifference . . . [,] what was the defendant's knowledge of the weapons? . . . [H]e knew [Phillip] had that gun. He talked to all of his co-defendants about Smith strangling her. He was present when the screwdriver was used to . . . stab her. [¶]

"[W]as he physically present at the crime with an opportunity to aid the victim or keep the crime from occurring? No question. He was there every single second, could have stopped this at any point in time. When the police officer came by the car, he could have said, 'Somebody is gurgling in the trunk.' . . . [H]e did not aid in any capacity the victim in this case. The duration . . . was a very long involved torture, beating, and murder of the victim. [¶]

"His knowledge of the cohort's likelihood of killing . . . [—] he was close friends with [Phillip]. He'd been involved in committing crimes with [Phillip] before. So he knew that [Phillip] would be a reliable co-conspirator in this . . . . [¶]

"[W]hat steps did he take to minimize the risk of violence? He took zero steps."

Substantial evidence supports these determinations. Thus, even disregarding the trial court's findings on aiding and abetting, the order denying Hildahl's petition would be affirmed on this felony murder theory.

D.    *The Trial Court Did Not Impermissibly Base Its Findings on the Prior Appellate Opinion or Jury Verdict*

In ruling on Hildahl's petition, the trial court repeatedly mentioned that it had read and considered the reporter's transcript from his trial. Indeed, immediately before issuing the ruling, the court noted, "And again, I will state I reviewed the trial transcript." While explaining the ruling, the

14

court remarked, "The evidence at trial clearly shows [Hildahl] was intricately involved in each stage of the planning and the killing of the victim."

Nevertheless, focusing on some isolated remarks that indicate the court at one point also referred to analysis from the prior appellate opinion and inferences from the jury's verdict, Hildahl contends that the trial court considered improper material leading to a prejudicially erroneous ruling. Before addressing the argument, some additional background is necessary to provide context.

At the hearing, defense counsel questioned the credibility of testimony from Ponce, who was not charged, but counsel asserted could have been. The court interjected to ask how Ponce could have been charged given the facts and mentioned that "the Court of Appeal dealt with that in its decision."

Significantly, defense counsel recognized that by referring to something other than the procedural history in the prior appellate opinion, the court was veering off target. Counsel redirected the court to consider only the trial testimony, stating, "the Court . . . has to put itself back into that position again. The Court becomes the jury that was sitting at that particular time."

Later during the hearing in addressing whether Phillip's trial testimony was credible, the court commented that the jury's verdict indicated they did not believe him, stating:

> "[I]n reviewing the trial testimony, the closing arguments of counsel, the instructions given to the jury at trial, it appears to me quite clear that they [the jury] rejected [Phillip's] testimony and they found [him] to be not credible." [¶] . . . [¶]
>
> "So I'm left with what I believe to be the conclusions made by the trier of fact in the trial. . . . I believe the jury rejected [Smith's testimony]. So what do I do with that . . . ?"

15

Answering the court's question, "So what do I do with that," defense counsel again correctly directed the court to disregard the jury's credibility determination and instead decide credibility issues itself as trier of fact in a 1172.6 hearing:

> "I understand the court's position. And I think that the court, *as the [factfinder] now* . . . has to look at the testimony of the percipient witnesses. [¶] . . . [¶]

> "Obviously, the court feels that Mr. Ponce had some credibility. And so, . . . *that's the court's role as the [factfinder] to determine the credibility of the witnesses.* [¶]

> "[T]he court isn't sitting as an appellate reviewing court to see if there is a sufficiency of the evidence to convict." (Italics added.)

In making its ultimate decision after hearing arguments from both parties, the trial judge thoroughly analyzed the murder theories. Significantly, at no point did she make any reference to the prior appellate opinion, the jury's verdicts, or the jury's credibility determinations. Rather, the court expressly stated she was relying on the trial testimony.

Like we would do when interpreting any other type of writing, we must look at the transcript as a whole—and not isolated parts—to ascertain its meaning. (See *Chin v. Namvar* (2008) 166 Cal.App.4th 994, 1009.) Here, each time the court appeared poised to stray from the correct standard, defense counsel quite commendably corrected the judge and emphasized the court's role as an independent trier of fact. In issuing her ruling, the judge then hewed to her proper role. She cited trial testimony and did not defer to the jury's findings or its credibility determinations, but instead made her own. Based on the record as a whole, we are confident that the trial court understood and applied the appropriate legal standard. (See *People v. Cartier* (1960) 54 Cal.2d 300, 313 ["where a judge's statements as a whole

16

disclose a correct concept of the law and its application, no secondary remarks should be deemed to have impeached [her] determination"].)

## DISPOSITION

The order is affirmed.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


BUCHANAN, J.