Filed 12/1/23  P. v. Huber CA2/5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B317860 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA048904) |
| v. | |
| EILEEN MARIE HUBER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Blythe J. Leszakay, Deputy Attorney General, for Plaintiff and Respondent.

In 1992, defendant Eileen Marie Huber (defendant) was convicted of numerous crimes, including three murders, that took place during her participation in a two-month crime spree with several accomplices. The trial court sentenced her to life in prison without the possibility of parole. Decades later, defendant filed a Penal Code section 1172.6 (former Penal Code section 1170.95) petition for resentencing.[1] The trial court appointed counsel for defendant, held an evidentiary hearing, and denied defendant's petition. The court found, relying on transcripts of defendant's trial, that she was a direct aider and abettor in the three murders for which she was convicted and accordingly still could be found guilty of those crimes under current law. We consider whether the court's direct aiding and abetting finding is supported by substantial evidence.

## I.  BACKGROUND

In November 1991, in a 27-count indictment, defendant, her boyfriend John Lewis (Lewis), his sister Robbin Machuca (Machuca), and Machuca's boyfriend Vincent Hubbard (Hubbard) were charged with committing a host of crimes between July 5 and August 27, 1991: murder, robbery, kidnapping for robbery, kidnapping, receiving stolen property, and conspiracy to commit the aforementioned felonies. Defendant was specifically charged, among other things, with the murder of Jose Avina (Avina), Willie Newton Sams (Sams), and Shirley Denogean (Denogean).

---

[1]    Undesignated statutory references that follow are to the Penal Code.

*A.      Evidence at Trial Regarding Defendant's Role in the*
*Murders of Avina, Sams, and Denogean*
*1.      Avina's murder*

In the summer of 1991, defendant, Lewis, Machuca, and Hubbard were living together in an apartment in West Covina, California.  On the night of July 5, 1991, defendant and Lewis set out to "go make some money."

The plan was for defendant and Lewis to drive around in her vehicle, along with two accomplices in another vehicle, and look for a victim whose automobile was loaded with "a lot of stuff . . . that could be sold."  After identifying a suitable victim, the plotters would "bump" the victim's car and force him or her to pull over to the side of the road.  As defendant later explained to the police, if the victim cooperated, he or she "wouldn't be harmed"; if the victim did not cooperate, though, the conspirators would "shoot him."

When they set out that night, Lewis, as was his custom, was armed (with a sawed-off shotgun on this occasion).  After a time, the plotters spotted Avina's red truck, which looked like it was "worth some money" and had "some gadgets in it."  The two-car convoy of conspirators followed Avina's truck onto and then off a freeway.  When a "bump" to the rear of Avina's vehicle by the accomplices' vehicle failed to bring the truck to a stop, the collaborators hemmed Avina in—the accomplices' vehicle alongside the truck and defendant's coupe behind it.

Eventually, Avina pulled his truck over in a dark residential area of Monrovia.  With the truck idling near a stop sign, Lewis exited defendant's car and confronted Avina, telling him to get out of the truck.  When Avina refused and attempted to drive away, Lewis fatally shot him in the head.  The truck

3

climbed the curb, rolled onto a lawn, and came to a stop short of a house. Once the truck stopped, Lewis pulled Avina's body from the truck, "dumped" it on the grass, and climbed into truck's cab.

Defendant followed Lewis (driving Avina's truck) to the home of one of the accomplices. Once there, they stripped the truck's interior of a stereo, an amplifier, a set of "big" speakers, and a collection of compact discs. Lewis then drove the truck to Pomona, again followed by defendant in her vehicle, which is where they abandoned it.

### 2. *Sams' Murder*

On the night of August 18, 1991, Sams was robbed at gunpoint at an automatic teller machine (ATM) and then driven in his automobile to another ATM and forced to withdraw more money from his account. From the second ATM, Sams was driven to a third location, a middle school, where he was forced into a dumpster and then shot multiple times by two different guns.[2] Sams' automobile was found a few days later at a shopping mall with the doors open and its radio missing.

---

[2] After Avina's murder, but before the murder of Sams, Lewis committed additional crimes—sometimes with defendant's assistance. Among the crimes was the robbery and kidnapping of Eugene Valdez. After her arrest, defendant admitted to police she had observed Valdez sleeping in his car in the parking lot of a restaurant, watched as he was forcibly abducted, followed the kidnappers in her car, and drove away in the company of one or both of the kidnappers in Valdez's vehicle after Valdez escaped when one of the kidnappers attempted to shoot him (but failed because the gun misfired).

In addition, before Sams' murder, the home of defendant's father was burglarized. The burglars stole ammunition and a

On the night of Sams' murder, defendant, Lewis, and Hubbard were seen by a witness leaving "at the same time." Both Lewis and Hubbard later confessed to shooting Sams even though he had complied with all of their demands. Defendant's fingerprint was found on one of the weapons used to kill Sams: the Ruger stolen from her father's home. Defendant, after initially denying any role in Sams' murder, confessed to being "involved" and affirmed she "went out on that one." She also admitted that shortly after the murder she had used Sams' ATM card to withdraw $60 from his account.

### 3. *Denogean's murder*

On August 27, 1991, Lewis and defendant drove to the Puente Hills Mall in defendant's vehicle to look for a robbery victim.[3] Lewis was armed with the stolen Ruger and had brought with him plastic ties to restrain the victim.

As they drove through the mall's parking lot, they saw Denogean driving alone in her Mercedes. Defendant parked next

---

number of firearms from the father's gun collection, including a Ruger .357 Magnum pistol (the Ruger). Prior to the burglary, defendant had been heard to talk repeatedly about stealing firearms from her father's collection—saying at one point in Lewis's presence that they should "take the guns from my Dad's house."

[3] Three days earlier, Lewis had driven to the same shopping mall and kidnapped Elizabeth Nisbet; after withdrawing funds from her bank account at two different ATMs, Lewis murdered her by the side of a freeway. One day later, Lewis gave Nisbet's wedding ring to defendant as an engagement ring.

to Denogean's vehicle and she and Lewis watched Denogean walk into the mall and waited for her return.

When Denogean returned a short time later, Lewis forced himself inside her Mercedes and bound her hands. Defendant obtained Denogean's bank card and personal identification number (PIN) and drove Lewis and Denogean in her Mercedes to several ATMs, where defendant withdrew a total of $500 from Denogean's bank account. They then returned to the mall where defendant, driving her vehicle, followed Lewis and Denogean in the Mercedes onto a freeway. On the shoulder of the freeway near an off-ramp, the two cars parked; Lewis then led Denogean down an embankment where he shot her multiple times with the Ruger.

After the shooting, defendant followed Lewis in the Mercedes to a location where they wiped the Mercedes of their fingerprints before driving to a second location where they abandoned the vehicle. Later that same day, defendant took a portion of the funds stolen from Denogean's bank account and went shopping. Early the next morning, she went to an ATM and withdrew an additional $200 from Denogean's bank account.

Following the arrest of defendant, Lewis, and Machuca on August 30, 1991, a police officer overheard and recorded some of the statements defendants made to each other while locked in holding cells. When Lewis observed that defendant had participated in the killing of three victims, defendant did not deny or otherwise contradict him. After Machuca remarked that "at least" they had "fun" committing their crimes, defendant said she "would do it all over again."

6

### 4. The jury verdicts and sentencing

A trial jury convicted defendant of the first degree murders of Avina, Sams and Denogean, along with conspiracy to commit murder and other crimes. For each of the murder counts, the jury found true robbery-murder (§ 190.2, subd. (a)(17)(A)) and lying-in-wait (§ 190.2, subd. (a)(15)) special circumstance allegations. For the Sams and Denogean murders, the jury also found true kidnapping-murder (§ 190.2, subd. (a)(17)(B)) special circumstance allegations. With regard to Denogean's murder, the jury found true a multiple murder (§ 190.2, subd. (a)(3)) special circumstance allegation. The trial court sentenced defendant to three concurrent terms of life in prison without the possibility of parole. On direct appeal, a different panel of this court, with minor modifications, affirmed the judgment. (*People v. Hubbard, et al.* (Oct. 3, 1994, B074596) [nonpub. opn.].)

### B. Defendant's Petition for Resentencing

In 2019, nearly three decades after her murder convictions, defendant petitioned for resentencing pursuant to section 1172.6. Without appointing counsel for defendant or holding a hearing, and relying solely on the opinion resolving defendant's direct appeal, the trial court summarily denied the petition. We reversed, holding the opinion on direct appeal alone was insufficient to find defendant ineligible for relief as a matter of law. (*People v. Huber* (Dec. 30, 2020, B301360) [nonpub. opn.].)

On remand, the trial court appointed defendant's former trial attorney as defense counsel for proceedings on the petition. After both parties submitted briefing, the court issued an order to show cause and set the matter for a hearing.

The trial court held the hearing on the petition in November 2021. The court admitted into evidence "all of the paperwork in the court file," which it had reviewed in advance of the hearing and included the transcript of defendants' trial. No witnesses testified at the hearing, and neither party offered any additional documentary evidence.

After hearing argument from both parties, the court denied the petition. The court made two alternative findings beyond a reasonable doubt: (1) that "defendant, with intent to kill, aided and abetted" the murders of Avina, Sams, and Denogean and "could be found guilty of murder under current law"; and (2) that "defendant was a major participant" in the murders who acted "with reckless disregard for human life."

## II. DISCUSSION

The evidence at trial amply established defendant could be convicted under current law as a direct aider and abettor for the three murders in question.[4] She and her codefendants initially agreed to hunt for robbery victims and to kill any of the victims who resisted; over time, however, they began killing (or attempting to kill) all robbery victims regardless of their cooperation. Defendant assisted in the conspiracy's first murder by driving Lewis, her armed boyfriend and apartment mate, in a search of a robbery victim. After finding Avina and watching Lewis kill him following Avina's resistance, she helped Lewis loot and abandon Avina's truck. Following Avina's murder, defendant

---

[4] Because we so hold, we need not discuss the evidence in context of support for the trial court's alternative major participation and reckless indifference findings.

8

repeated her role as at least a driver and thief in the robbery-murders of Sams and Denogean (as well as in the kidnapping, robbery, and attempted murder of Valdez).  Defendant also helped bolster the conspiracy's capacity for violence by facilitating the burglary of her father's home to obtain arms and ammunition.  From these assistive acts, it can reasonably be inferred that defendant had knowledge of the actual killer's unlawful intent and intended to assist in achieving that unlawful end.  (See generally *People v. Curiel* (Nov. 27, 2023, S272238) ___ Cal.5th ___ [2023 WL 8178140], *19.)

### A.    *Section 1172.6 and Appellate Review*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  (Stats. 2018, ch. 1015, § 1, subd. (f).)"  (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)  "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought."  (*People v. Gentile* (2020) 10 Cal.5th 830, 848.)  A defendant is liable for murder perpetrated by an accomplice if he "'aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'"  (*In re Lopez* (2023) 14 Cal.5th 562, 585.)

9

On appeal from the denial of a petition for resentencing under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v.* Reyes (2023) 14 Cal.5th 981, 988.) "Under this standard, we review the whole record '"in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."' [Citation.]" (*Ibid.*)

B.     *Defendant Is Ineligible for Resentencing*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart.' (§ 188, subd. (a)(2))." (*Gentile, supra,* 10 Cal.5th at 844.)

Because there is rarely direct evidence of intent, "it is well settled that intent to kill or express malice, . . . , may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 355 ["Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially"]; *Hudson v. Superior Court* (2017) 7 Cal.App.5th 1165, 1171 ["a person's intent 'is a question of fact to be determined from all the circumstances of the case'"].) Factors to consider when determining whether a person aided and abetted the commission of a crime "'include presence at the scene

10

of the crime, failure to take steps to attempt or prevent the commission of the crime, companionship, flight, and conduct before and after the crime.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273; accord, *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.)  Substantial evidence here supports the trial court's finding that defendant harbored express malice and directly aided and abetted the killings of Avina, Sams, and Denogean.

Defendant's own admissions established she intended Avina to be shot if he resisted the planned robbery, which he did by first refusing to pull over and then attempting to flee when Lewis threatened him with the sawed-off shotgun.  Defendant was present for the murder and made it possible by driving an armed Lewis to the scene.  Further, after Lewis shot Avina in the head, defendant assisted with the completion of the robbery-murder by following Lewis, who was driving Avina's truck, to one location where the truck was plundered, and then to another where it was abandoned.

After the Avina murder, defendant and her partners in crime began killing (or attempting to kill) their identified robbery victims regardless of whether the victims resisted.

Sams was killed with defendant's assistance even though he had not resisted and had cooperated with his kidnappers by surrendering his PIN to them.  Defendant was seen in the company of Lewis and Hubbard prior to the shooting, the shooting was accomplished with at least one weapon obtained from the burglary of defendant's father's home and with defendant's fingerprint on it, defendant admitted she was "involved" with the murder and "went out on that one," and defendant used Sams' bank card to withdraw money after the

11

murder.  In view of this evidence and defendant's role in the preceding and subsequent crimes (including the robbery and attempted killing of Valdez), the trial court could reasonably infer defendant intended to kill Sams, knew of Lewis's plan to do the same, and intended to facilitate that plan.

As for victim Denogean, defendant played a critical role in the kidnapping-robbery-murder.  She acted as a victim-spotter, ATM-thief, and get-away driver for Lewis.  Denogean, like Sams, was executed despite her cooperation with her kidnappers—and she was killed with a weapon defendant helped acquire.  After defendant's arrest a few days after the murder, defendant expressed no remorse over any of the killings; instead, she stated that if she had the chance she would do it all over again.  The evidence concerning the Denogean crimes was accordingly sufficient to support the trial court's finding that defendant knew of Lewis's murderous intent and intended to assist in achieving that unlawful end..

DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



RUBIN, P. J.



KIM, J.