Filed 10/7/24  P. v. Alcantar CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CESAR ALCANTAR,<br><br>    Defendant and Appellant. | B329238<br><br>(Los Angeles County<br>Super. Ct. No. VA071988) |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County.  Lee W. Tsao, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Cesar Alcantar appeals the denial of his petition for resentencing under Penal Code[1] section 1172.6 (former § 1170.95) following an evidentiary hearing.  Appellant's sole contention is that substantial evidence does not support the superior court's finding that appellant is guilty of murder under a theory that remains valid under current law.  We disagree and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### A. *The killing of John Barbosa*[2]

One evening in July 2002, Alcantar and fellow Rivera gang members Daniel Luna and Cynthia Vargas were in Rivera Park, located in Rivera gang territory.  John Barbosa, his brother James, and Pedro Brache were also at the park that night.  Alcantar and Vargas approached James, and Alcantar asked James where he was from.  James understood the question as seeking his gang affiliation, and when he denied being from any gang, Alcantar punched James in the face.  Not wanting any trouble, James turned and walked away.

Alcantar, Vargas, and Luna went to another area in the park where they started writing "Rivera" and other gang graffiti

---

[1] Undesignated statutory references are to the Penal Code.

[2] The underlying facts are drawn from the trial record in appellant's direct appeal from his conviction (*People v. Alcantar et al.* (Apr. 20, 2005, B175349) [nonpub. opn.]), which the superior court considered at the section 1172.6 evidentiary hearing and which we have judicially noticed.  (See § 1172.6, subd. (d)(3) [at the hearing to determine petitioner's eligibility for relief, "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed"].)

on a wall. But a few minutes later they approached James again. Vargas threw a beer can at James, and when it merely glanced off his head, she yelled, " 'damn.' "

Alcantar again pressed James about his gang membership. Unsatisfied with James's answers, Alcantar swung at James's face a second time but missed, and James tried to swing back. Alcantar hesitated, and then punched James in the face again. The two men rushed each other. They fell to the ground, and in moments, the much larger James was on top of Alcantar, dominating the fight. John attempted to separate James and Alcantar, and pulled Vargas and Luna away as they punched and kicked James.

As the fight continued, Vargas yelled to Luna, " 'Shoot. Shoot the motherfucker.' " A few seconds later Alcantar yelled, " 'Hurry up and shoot this motherfucker.' " Luna, who was wearing gloves, pulled a handgun out of his pants, and John stepped between Luna and James, yelling, " 'Stop. Stop. No. No.' " Luna pointed the weapon, and fired two or three times. One bullet struck John in the back. Luna then walked up to John and fatally shot him in the back of the head.

Alcantar, Vargas, and Luna ran away with James in pursuit. Vargas and Alcantar got into one vehicle, Luna in another, and they all drove away. An eyewitness testified that if John had not stepped between Luna and James, Luna would have shot James in the back while James was on top of Alcantar.

### B. Appellant's conviction

Alcantar and Vargas were charged and tried together for John's murder. (*People v. Alcantar et al.* (Apr. 20, 2005, B175349) [nonpub. opn.].) Both were convicted by a jury of first degree murder (§ 187, subd. (a)) with findings as to each

3

defendant that a principal used a firearm (§ 12022.53, subds. (d), (e)(1)) and that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The trial court sentenced each defendant to 60 years to life, consisting of 25 years to life for the first degree murder plus consecutive terms of 25 years to life for the firearm enhancement and 10 years to life for the gang enhancement.

On appeal from the judgment, this court ordered the 10-year gang enhancement stricken but otherwise affirmed defendants' convictions.  On remand the superior court modified Alcantar's sentence to a term of 50 years to life.[3]

### C. *Alcantar's petition for resentencing under section 1172.6*

In July 2021, Alcantar filed a petition for resentencing pursuant to section 1172.6.  The superior court found a prima facie case for relief and issued an order to show cause.  The parties submitted briefs, and at the evidentiary hearing the superior court admitted six volumes of trial transcripts into

---

[3] Following the California Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155, Vargas filed a petition for writ of habeas corpus in the superior court on the ground that she could not be convicted of murder in the first degree under the natural and probable consequences doctrine.  The People agreed to accept resentencing for second degree murder.  The superior court vacated Vargas's first degree murder sentence and imposed a term of 40 years to life, consisting of 15 years to life for second degree murder plus 25 years to life for the firearm enhancement. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 949 (*Vargas*).)

Alcantar's petition for writ of habeas corpus based on the *Chiu* error is currently pending before this court.  (*In re Cesar Alcantar*, B335404.)

evidence.  Alcantar and Megan Williamson, a clinical psychologist who had interviewed Alcantar, testified.  Following argument by the parties, the superior court denied the petition.  The court concluded the prosecution had proved beyond a reasonable doubt that Alcantar is guilty of murder as an aider and abettor with implied malice, a theory which remains valid under current law.

## DISCUSSION

**Substantial Evidence Supports the Superior Court's Finding that Appellant Is Guilty of Murder Under a Theory that Remains Valid After the Amendments to California's Murder Law**

### A. *The section 1172.6 evidentiary hearing*

Appellant testified at the evidentiary hearing.  He explained that at the time of this incident, he was 25 years old and was struggling with drugs and alcohol.  Appellant started drinking heavily and using methamphetamine and other drugs when he was 16 years old, around the same time he joined a gang.

On July 12, 2002, appellant bought a 12-pack of beer after work and went to a friend's apartment, where he drank six of the beers.  After two or three hours, appellant and Vargas left together in Vargas's car.  As they were pulling out of the driveway, Luna came up and asked for a ride.  Appellant had seen Luna before that day, but did not even know his name.  With Vargas driving, they picked up another friend, bought some food, and went to the park.  Appellant continued drinking the beer he had bought earlier.

When appellant saw James at the park, he felt threatened because he thought James "looked like a typical gang member."

5

Appellant confronted James and demanded to know who he was and what gang he was from. James responded that he was "Animal" from Rivera 13. But appellant had never seen James before and thought he was lying. Feeling insulted, appellant punched James in the face. James just walked away, and appellant followed Luna to the back of the park, where Luna spray painted appellant's and Vargas's names on a wall.

Appellant was drunk, and believing he "would be able to take somebody much bigger than [him]self," he walked back to confront James again. Appellant demanded James identify himself, and when James gave the same answer, appellant punched him in the face again. James jumped on top of appellant, taking him to the ground, and started punching appellant in the head. As appellant was trying to defend himself, two gunshots rang out. James got off appellant, and appellant took off running. As he was running away, appellant heard another gunshot.

Appellant denied knowing that Luna had a gun. He also denied telling Luna to shoot, and he claimed he did not hear Vargas say anything about shooting a gun. He himself was not armed with any weapon, he did not supply a gun to Luna, and he did not intend that anyone would be shot that day.

Dr. Megan Williamson, a clinical psychologist, conducted a three-hour in-person interview of appellant and testified at the evidentiary hearing on appellant's behalf. Dr. Williamson explained that the prefrontal cortex—the portion of the brain responsible for reasoning that mediates emotions and rational thinking—does not fully develop until a person is 25 or 26 years old. Alcohol and drug abuse, particularly methamphetamine, during the teenage years can have a deleterious effect on the

6

development of the prefrontal cortex, resulting in poor decision-making and difficulty understanding long-term consequences. Dr. Williamson opined that a hypothetical 25-year-old man under the influence of alcohol after drinking a number of beers would be unable to carefully weigh and consider his actions or long-term consequences, leading to impulsive and aggressive behavior.

Following the parties' argument, the superior court stated its duty as independent fact finder was to "determine if the People have met their burden of proving beyond a reasonable doubt that Mr. Alcantar . . . remains guilty under a theory of murder that is viable after the amendments to the law," making him ineligible for relief under section 1172.6. After summarizing the underlying facts, the court rejected appellant's testimony that he did not know Luna was armed, finding it was not credible. The court reasoned that there was no evidence appellant and Vargas were ever separated from each other or Luna, and if Vargas knew Luna was armed (which she clearly did because she yelled at Luna to shoot), appellant also knew that Luna was armed. The court also rejected appellant's testimony that he had never told anyone to shoot. The court noted that James had specifically testified that appellant said, " 'Shoot the motherfucker,' " and because James and appellant were engaged in a hand-to-hand fight in that moment, James was in the best position to know whether appellant had said those words. The court thus found "beyond a reasonable doubt" that appellant had told Luna to shoot.

The superior court then proceeded to explain the legal effect of those words. In its view, appellant's actions did not constitute first degree premeditated murder, but did satisfy the elements for implied malice murder as an aider and abettor. The

7

court concluded, "Even considering [appellant's] age, his level of intoxication, and Dr. Williamson's testimony, I find beyond a reasonable doubt that all of [the elements for implied malice] are met; that [appellant] knew by saying, 'Hurry up, shoot the motherfucker,' that he consciously disregarded the risk to human life by doing so, and it is of no consequence that Mr. Luna shot John Barbosa instead of James Barbosa." Having found appellant guilty beyond a reasonable doubt of murder as an aider and abettor with implied malice, the court denied appellant's section 1172.6 petition.

## B. *Section 1172.6*

Enacted in 2018, Senate Bill No. 1437 (2017–2018 Reg. Sess.) effectively abolished the natural and probable consequences doctrine in cases of murder and limited the application of the felony-murder doctrine. (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) The legislation also served to eliminate murder convictions premised on any theory of imputed malice—that is, any theory by which a person can be convicted of murder for a killing committed by someone else, such as felony murder or the natural and probable consequences doctrine—unless the People also prove that the nonkiller defendant personally acted with the intent to kill or was a major participant who acted with reckless disregard to human life. (§§ 188, subd. (a)(3) & 189, subd. (e).) Specifically, the Legislature amended section 188 to require that when the felony-murder rule does not apply, a principal in the crime of murder "shall act with malice aforethought" and "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)

8

Section 1172.6 established a procedure for vacating the murder convictions of defendants who could no longer be convicted of murder because of Senate Bill No. 1437's amendments to sections 188 and 189.  (*Lewis*, *supra*, 11 Cal.5th at pp. 957, 959, 971; *Gentile*, *supra*, 10 Cal.5th at p. 843.)  After appointing counsel upon the filing of a properly pleaded petition for resentencing, the superior court must conduct a prima facie analysis with briefing to determine the petitioner's eligibility for relief, and, if the requisite prima facie showing is made, issue an order to show cause.  (§ 1172.6, subd. (c); *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

At the evidentiary hearing following issuance of an order to show cause, the superior court acts as an independent fact finder.  (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1065; *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)  The prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under a theory of murder that remains valid after Senate Bill No. 1437's amendments to the law of murder.  (§ 1172.6, subd. (d)(3); *People v. Strong* (2022) 13 Cal.5th 698, 709; *Garrison, supra,* at p. 745.)  The petitioner and the prosecutor may offer new or additional evidence, and the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony.  (§ 1172.6, subd. (d)(3); see *Gentile, supra*, 10 Cal.5th at pp. 853–854.)

Following an evidentiary hearing, we review the superior court's denial of the section 1172.6 petition for substantial evidence.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)  Under this familiar standard, we examine the record " ' " 'in the light most favorable to the judgment below to determine whether

9

it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*) We resolve whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, [we] 'presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715; *Vargas*, *supra*, 84 Cal.App.5th at p. 951.) Finally, we uphold the superior court's ruling " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 378.)

**C.** *Substantial evidence supports the superior court's finding that appellant is guilty of murder as an aider and abettor with implied malice*

Appellant argues the evidence is insufficient as a matter of law to support the superior court's finding that appellant could be convicted of first degree murder as an aider and abettor under current law. Appellant misstates the superior court's finding. The court stated it was not inclined to find appellant's actions constituted first degree premeditated murder, and instead found appellant guilty of second degree murder as an aider and abettor with implied malice. Second degree implied malice murder remains a valid theory of murder liability notwithstanding the changes to the law of murder made by Senate Bill No. 1437 (*People v. Schell* (2022) 84 Cal.App.5th 437, 442), and the court's finding is supported by substantial evidence.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "Second degree murder is

10

the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be express or implied. (§ 188, subd. (a).) "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder instead requires the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra,* 14 Cal.5th at p. 988.)

"[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) " 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.' " (*Reyes, supra,* 14 Cal.5th at p. 991, quoting *People v. Powell* (2021) 63 Cal.App.5th 689, 713 (*Powell*).)

11

As for the requisite intent, our Supreme Court has explained that " 'an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' " (*Reyes, supra,* 14 Cal.5th at p. 990, quoting *Gentile, supra*, 10 Cal.5th at p. 850.)  The aider and abettor "need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Powell, supra*, 63 Cal.App.5th at p. 714.)

Appellant argues that substantial evidence does not support the superior court's findings that appellant knew Luna had a gun and acted with implied malice in telling Luna to " '[h]urry up and shoot this motherfucker.' "  At the heart of appellant's argument is his contention that in the absence of any direct evidence, the superior court relied on appellant's social relationship with Vargas and "guilt by association" to find that appellant knew Luna had a gun.  Thus, according to appellant, the court's finding was based not on "substantial evidence but on unwarranted inferences, unsupported suppositions, and outright speculation."  We disagree.

Appellant correctly asserts that " '[a]n inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).)" (*People v. Davis* (2013) 57 Cal.4th 353, 360.)  And " '[w]hether a particular inference can be drawn from the evidence is question of law.' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 58.)  However, what

appellant seems to overlook is that it is not the appellate court that must assess the credibility of witnesses and draw reasonable inferences from the evidence; that is the exclusive province of the finder of fact. (*People v. Mumin* (2023) 15 Cal.5th 176, 202 [it is " 'the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts' "].) Here, the superior court properly assessed appellant's credibility and drew appropriate inferences from the evidence. Where the evidence supports the court's findings, we will not disturb its judgment. (*People v. Rivera* (2019) 7 Cal.5th 306, 331 [" '[i]f the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding' "]; *People v. Maury* (2003) 30 Cal.4th 342, 403 ["Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)

According to appellant's testimony at the evidentiary hearing, appellant and Vargas left their friend's apartment together. They were in Vargas's car, and Vargas was driving. As they were pulling out of the driveway, they saw Luna, who asked for a ride. From that moment, when Luna got into the car with appellant and Vargas, appellant, Luna and Vargas were never separated until Luna shot John and all three of them ran away. Based on this testimony, the superior court could—and did—reasonably infer that if Vargas knew Luna had a gun, appellant did too. Such an inference was plainly not based on

13

"guilt by association" or appellant's social relationship with Vargas, but on appellant's own testimony that he and Vargas and Luna were never separated once Luna joined appellant and Vargas in Vargas's car and the three of them went to the park.

Weighing appellant's credibility, the superior court also rejected his testimony that he did not tell Luna to shoot. Although some of the testimony at trial was conflicting on this point, the court explained that James was in the best position to hear what appellant said or did not say, and he testified unequivocally that appellant yelled at Luna, " 'Hurry up and shoot this motherfucker.' " In short, drawing reasonable inferences from the evidence and assessing appellant's credibility, the superior court was entitled to reject appellant's self-serving testimony and find appellant knew Luna was armed when he demanded that Luna fire his weapon into the fray.

Appellant's culpability for John's murder was no different than that of his codefendant Vargas. And as in Vargas's case, we conclude substantial evidence supports the superior court's finding that appellant acted with implied malice to directly aid and abet the murder. The evidence presented at trial established that appellant not only instigated the fight that led to the murder, but he joined Vargas in provoking Luna to shoot and kill John. All members or associates of the Rivera gang, appellant, Vargas, and Luna were at a park in territory claimed by the Rivera gang, drinking beer and spray painting gang graffiti on a wall. With Vargas and Luna standing by, appellant issued a gang challenge to James and punched him in the face. When the three returned, appellant again challenged James about his gang affiliation, and once more punched him in the face. James quickly dominated the ensuing fight, and got on top of appellant.

As James continued to pummel appellant, first Vargas, and then appellant yelled at Luna to " 'Hurry up. Shoot this motherfucker.' " Luna did as he was directed and shot into the brawl, striking John in the back and incapacitating him. While John attempted to stand up, Luna walked over and shot him in the back of the head. Appellant, Vargas, and Luna fled—appellant and Vargas in one vehicle and Luna in another.

As we found in *Vargas*, "[e]ven if these circumstances did not establish express malice on appellant's part, they certainly constitute sufficient evidence upon which the trial court could find, beyond a reasonable doubt, that appellant acted with implied malice in aiding and abetting the murder. (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 273 ['Factors to be considered by the trier of fact in determining "whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime" ].)" (*Vargas, supra,* 84 Cal.App.5th at p. 955.)

We emphasize, as we did in *Vargas*, that "the essence of aiding and abetting a murder under an implied malice theory is the accomplice's act of aiding, by words or conduct, the commission of a life-endangering act with knowledge of the danger to life that the act poses. (*Powell*, *supra*, 63 Cal.App.5th at p. 714.) Such an aider and abettor need not intend to aid a killing to be held criminally liable for the result of the perpetrator's act. (*Gentile*, *supra*, 10 Cal.5th at p. 850; *Powell*, at p. 713.)" (*Vargas, supra,* 84 Cal.App.5th at p. 955.) Appellant knew that firing a gun at his opponent in a fight could ultimately result in someone's death, but he demanded that Luna hurry up

and do it anyway.  After he got out from under James, he did nothing to help John, but ran away as fast as he could.

Under these circumstances, we conclude substantial evidence supports the superior court's finding that appellant is guilty of murder as an aider and abettor who acted with implied malice, a theory that remains valid under current law.

## DISPOSITION

The superior court's order denying Alcantar's petition for resentencing under Penal Code section 1172.6 is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.

16